**UNITED STATES of America,
Appellant,**

v.

**Edward C. BECKER, Administrator of the
Estate of Ernest J. Becker, Deceased,
Appellee.**

**No. 21110.**

United States Court of Appeals
Ninth Circuit.

May 16, 1967.

Barefoot Sanders, Asst. Atty. Gen., David L. Rose, Atty., Harvey L. Zuckman, Atty., Civil Div. Dept. of Justice, Washington, D. C., Richard C. Gormley, present U. S. Atty., William P. Copple, former U. S. Atty., John Eldridge, Asst. U. S. Atty., Phoenix, Ariz., for appellant.

Robert C. Kelso, James Moeller, D. W. Grainger, Lewis, Roca, Scoville, Beauchamp & Linton, Phoenix, Ariz., for appellee.

Before HAMLEY, HAMLIN and DUNIWAY, Circuit Judges.

HAMLEY, Circuit Judge:

The personal representative of Ernest J. Becker, deceased, brought this action against the United States under the Federal Tort Claims Act (Act), 28 U.S.C. §§ 1346(b) and 2671 et seq. (1964), to recover damages for the wrongful death of Becker. Becker was killed while riding as a passenger in an airplane being used on a forest fire reconnaissance flight for the Forest Service of the United States Department of Agriculture. The airplane crashed while making low-altitude passes over a small fire in the Apache National Forest near Springerville, Arizona.

Plaintiff sought damages in the sum of $750,000. After a non-jury trial, the district court entered judgment for plaintiff in the sum of $322,995, plus costs. The United States appeals.

On or about June 5, 1962, the Forest Service entered into an agreement entitled "Survey of Aircraft Availability," with an airplane pilot named Robert McIlrath. Pursuant to that agreement, McIlrath made available to the Forest Service his Cessna 180 aircraft at the Springerville airport, and his services as pilot of that aircraft. During the succeeding twenty days, McIlrath made a number of flights at the request of the Forest Service for which he was paid $762, computed at the rate of $30.00 an hour.

At about 10:45 a. m. on June 25, 1962, a small forest fire was reported in the Apache National Forest. Fire fighters, under the supervision of the Springerville District Ranger Station, were dispatched on the ground to the fire for the purpose of suppressing it. At approximately 4:00 p. m. on that day, the Cessna 180 aircraft referred to above, piloted by McIlrath, with Kenneth Sahlin, the Fire Control Officer of the Apache National Forest, and Becker, also on board, began a reconnaissance flight of the fire area. The crash occurred during this flight, killing all three occupants.

On the issue of liability the United States does not question the trial court's finding and conclusion that Becker's status as a passenger in the airplane was such that the pilot owed him the duty of exercising reasonable care in the operation of the airplane.[1] Nor does it ques-

---

1. Becker had long been interested in the conservation and development of natural resources. The Forest Service, following the practice of maintaining the good will of leading members of the community who were interested in conservation, had named Becker as one of its Forest Service "cooperators." Forest Service reg-

tion the trial court's finding and conclusion that the airplane crash which resulted in the death of Becker was caused by the negligence of the pilot.

The United States does question, however, the finding and conclusion that at the time of the accident, the pilot, McIlrath, was an employee of the United States Government within the meaning of 28 U.S.C. §§ 1346(b) and 2671. Instead, the Government urges that McIlrath was rendering service for the United States as an independent contractor and the United States is therefore not liable under the Act.

 Section 2671 defines "[e]mployee of the government" as including, among others, " * * * officers or employees of any federal agency * * *." Whether the pilot, McIlrath, was an employee of the Forest Service of the United States Department of Agriculture, is a question of federal law. Under federal law, the word "employee," as used in the Act, is to be read as having the same general meaning as the term "servant" has in the body of law relating to the doctrine of *respondeat superior*. Brucker v. United States, 9 Cir., 338 F.2d 427, 428, n. 2.

In the body of law relating to the doctrine of *respondeat superior*, certain criteria have been formulated for determining whether, under the circumstances of a particular case, an individual is a servant or an independent contractor. A list of the criteria most often applied is set out in Restatement (Second) Agency, § 220(2) (1958), quoted in the margin.² This section of Restatement (Second), was called to the trial court's attention in the Government's pre-trial brief.

██ In weighing the evidence to determine whether McIlrath was an "employee" of the United States at the time of the accident, the trial court exercised a fact-finding function. See Brucker v. United States, 9 Cir., 338 F.2d 427, 428, n. 3. There being no indication that the trial court applied irrelevant criteria in the instant case, it follows that its determination that McIlrath was an employee of the United States at the time of the accident, represents a finding of fact as to which we must apply the clearly erroneous test of Rule 52(a), Federal Rules of Civil Procedure. See El Paso Natural Gas Co. v. United States, 9 Cir., 343 F. 2d 145, 146.

There are a number of items of evidence in this case which, evaluated in the light of the criteria set forth in the Restatement (Second), tend to indicate that

---

ulations permit cooperators to go on Forest Service flights. The Fire Control Officer, Sahlin, had apparently invited Becker to go on this particular flight.

2. § 220. Definition of Servant

"(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business;

"(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

"(d) the skill required in the particular occupation;

"(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

"(f) the length of time for which the person is employed;

"(g) the method of payment, whether by the time or by the job;

"(h) whether or not the work is part of the regular business of the employer;

"(i) whether or not the parties believe they are creating the relation of master and servant; and

"(j) whether the principal is or is not in business."

McIlrath was an independent contractor engaged by the Forest Service to provide a manned airplane for flight reconnaissance of fires in the Apache National Forest.

McIlrath was not in the Civil Service of the Federal Government and did not receive a fixed salary on a regular basis from the Forest Service. He was not subject to deductions from his compensation for retirement, health insurance, taxes and the like. He could refuse a call for his services without assigning substantial reasons therefor. He was not required to be available for service at any time, but only after being notified to assume a stand-by role.[3]

McIlrath was paid by the local Forest Service administrative officer under a voucher system, rather than by the Forest Service payroll section. His work for the Government was performed pursuant to a standard form written contract known as the "Survey of Aircraft Availability," which he entered into with the Forest Service. Under this contract, the rate of compensation covered not only his own services but the use of his private airplane. He was apparently required to maintain the airplane and provide the gasoline.

On the other hand, there are other items of evidence which, evaluated in light of the same criteria, tend to indicate that McIlrath performed his services as an employee of the Forest Service, leasing to the Government his own airplane to the extent that it was needed to perform his employment duties.

McIlrath did not enter into his contract with the Forest Service pursuant to competitive bidding, but after elaborate testing procedures, was selected by Forest Service personnel on the basis of his availability, technical competence and the suitability of his aircraft. This contract required McIlrath to meet Forest Service requirements in all respects.[4] It also specified the pilot's home base.

McIlrath was not paid a lump sum for achieving a particular result, but was paid at the rate of $30 an hour for himself and his airplane, when called upon to fly reconnaissance missions. He was required to maintain his qualifications as a pilot according to Forest Service standards, including submission to annual inspections and checks, and participation in training courses.[5] McIlrath could not designate others to fly his aircraft on reconnaissance flights.

McIlrath operated under the detailed control and direction of the Forest Service, as manifested by Forest Service regulations which were binding upon him, and through specific directions given to him by the Fire Control Officer. These regulations and directions specifically included the matter of minimum altitude for reconnaissance flights. While McIlrath could, for safety reasons, refuse to fly when requested or, for the same reasons, make his own decisions as to altitude or other aspects of flight, he was otherwise subject to close supervision and control in flight. The Fire Control Officer was in charge of each flight and told the pilot "when and where to go and

3. When told to be on "stand-by," however, McIlrath had to have his aircraft ready to go on thirty minutes' notice.

4. The Forest Service Regulations are published in a "Forest Service Handbook" issued by the United States Department of Agriculture. These regulations lay down detailed requirements for the pilot's qualifications (Sec. 5703), require "frequent, careful, intensive inspections" of the pilot (Sec. 5702.33a), provide a detailed checklist to be used in inspecting the pilot and his plane (Sec. 5702.33b

1 and 2), gives detailed rules for operation of the plane (Sec. 5705), and require the pilot to obey the directives of Forest Service personnel when compliance would not violate Civil Air Regulations or endanger the aircraft, occupants or cargo (Sec. 5705.11e).

5. These annual reviews relate to a pilot's medical information, the currency of a pilot's flying license, his accident history, and whether any "derogatory remarks" have been made against him.

what to do." If the Forest Service did not like McIlrath's flying techniques or the way he maintained his airplane, it could terminate his services.

■ Considering these contrasting items of evidence, we are not left with the definite and firm conviction that a mistake was committed by the trial court in making the ultimate finding that McIlrath was serving as an employee of the United States at the time of the accident. See United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; Rederi A/B Soya v. SS GRAND GRACE, 9 Cir., 369 F.2d 159, 165.

In so concluding we have not overlooked the court decisions cited by the parties in which, under the varying circumstances of those cases, it was held that the individual in question was, or was not an employee of the United States. We regard the facts of this case as being so unique, however, that the determinations of the ultimate factual issue in these other decisions are not helpful in deciding that issue in our case.[6]

The United States also argues that the trial court erred in its award of damages, because it failed to subtract from the total of decedent's future estimated earnings, the amount it would have cost decedent to maintain himself and pay his federal income taxes over his life expectancy.

The district court found that the loss to decedent's children included $281,-790.14, representing the accumulation of future estimated earnings, discounted for present value, that would have come to them but for decedent's death.[7] In so finding, the Government asserts, the trial court relied upon the testimony of a consulting actuary, who testified that Becker's life expectancy at the time of death was thirty years and seven months, and that utilizing a discount figure of 3.5 percent, the present value of lost gross earnings over his life expectancy would be $281,790.14, assuming annual gross earnings of $15,000.

The Government argues that such an award is erroneous because it fails to take into account the above-mentioned factors which would necessarily have prevented decedent's survivors from obtaining all of his gross income had he lived. The Government further contends that the asserted excess of the award above actual loss must be viewed as punitive damages barred by 28 U.S.C. § 2674 (1964). The Government calls attention to considerations which, in its view, would have warranted at least a one-third deduction from the total award to represent what Becker would reasonably have spent to maintain himself had he lived out his life expectancy. We are urged to remand for recomputation of damages, in the event we sustain the district court on the issue of liability.

In accepting, as one element of damages, the $281,790.14 figure referred to above, the trial court found that Becker's income would have been "at least" $15,-000 per year. The quoted words indicate that the court regarded the $15,000 figure as a minimum, not a maximum.[8] This may very well account for the fact

---

6. In view of our holding that the trial court did not err in finding that McIlrath was serving as an employee of the United States at the time of the accident, we do not reach appellee's alternative argument that Becker was acting on behalf of a federal agency in an "official capacity," within the meaning of "employee" as defined in 28 U.S.C. § 2671, and is therefore, apart from common law concepts of the master-servant relationship, an "employee" within the meaning of that statute.

7. Becker's widow died before judgment was entered in the district court.

8. According to the actuary, if the assumed annual gross earnings during Becker's life expectancy was $22,000 instead of the assumed $15,000, the present value, employing a 3.5 percent discount figure, would be $413,291.46, exclusive of cost of living or tax deductions. And if the assumed annual gross earnings was $25,-000, the present value, exclusive of cost of living or tax deductions, would be $469,649.90.

that the trial court deducted nothing for prospective living expenses.

Insofar as this record indicates, the district court chose to accept the minimum figure of $15,000 annual gross income, and disregard deductions, rather than accept a higher annual gross income figure and attempt to prognosticate Becker's future cost of living.

So analyzed, we think the damage award accorded with the evidence and does not indicate disregard of proper standards to be applied. See United States v. Hayashi, 9 Cir., 282 F.2d 599, 602.

Under the Federal Tort Claims Act, the measure of damages is determined by the law of the place where the claim arises, in this case Arizona. *Hayashi,* supra, 282 F.2d at 605. The indications are that, under the law of Arizona, the incident of income tax has no part in arriving at a damage award. See Mitchell v. Emblade, 80 Ariz. 398, 298 P.2d 1034, 1037, adhered to in 81 Ariz. 121, 301 P.2d 1032, and the cases cited therein.[9]

The Arizona wrongful death damage statute, A.R.S. § 12.613 provides for "fair and just" damages. The determination of such damages, under this Arizona test, is primarily for the trier of fact. Merritt-Chapman & Scott Corporation v. Frazier, 9 Cir., 289 F.2d 849, 857–858. In Arizona, the fact-finder's damage award may not be overturned as excessive except where it is " * * * so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable, and outrageous * * *." Fulton v. Johannsen, 3 Ariz.App. 562, 416 P.2d 983, 988. We do not regard the damage award in this case to be excessive in this sense.

Affirmed.

9. Although at least one other circuit has allowed deduction of federal and state income taxes in computing future earnings under some circumstances, we are bound to look first to Arizona law which ap-

parently would not allow such a deduction. See Petition of Marina Mercante Nicaraguense, S.A., 2 Cir., 364 F.2d 118, 125–126.