Marlys **BEAR MEDICINE** and Delores Iron Shirt, as Co–Personal Representatives of the Estate of Leland Kicking Woman, George Kicking Woman, Molly Kicking Woman, Marlys Bear Medicine, individually and as guardian of Tanielle Kicking Woman and George Lee Kicking Woman, II, and Dana Murray, as guardian of Brandi Kicking Woman, Susan Kicking Woman, Lissa Kicking Woman and Leland Kicking Woman, Jr., Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

**No. CV–95–100–GF–DWM.**

United States District Court,
D. Montana,
Great Falls Division.

March 22, 2002.

Joe R. Bottomly, Bottomly Law Offices, Kalispell, MT, Monte D. Beck, Beck & Richardson, Bozeman, MT, for Plaintiffs.

George F. Darragh, Jr., Office of the U.S. Attorney, Great Falls, MT, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW & VERDICT

MOLLOY, Chief Judge.

### I. INTRODUCTION

This case stems from a catastrophic logging accident on the Blackfeet Reservation. The BIA had contracted with a local logging company, Lone Bear Logging, to harvest timber on the St. Mary's Unit of the Blackfeet Reservation. Leland Kicking Woman was at the logging site for a try-out as a feller. A tree fell in an unintended direction toward Kicking Woman and Malcolm New Robe, who was showing Kicking Woman around the site. Kicking Woman was struck by the falling tree as he pushed Malcolm New Robe to safety. Kicking Woman was rendered a quadriplegic and eventually died after spending nine months under medical care.

Plaintiffs filed an administrative claim on December 4, 1994 with the Department of Interior, Bureau of Indian Affairs. Plaintiffs asked for a total of $1,000,000.00 for loss of consortium and a total of $2,800,000 in wrongful death and survivorship damages. The BIA did not respond to the claim and it was therefore deemed denied at the claimant's option pursuant to 28 USC § 2675(a). Plaintiffs then brought this action under the Federal Tort Claim Act, 29 USC § 1346(b) and 28 USC § 2671 *et seq.* The Honorable Paul Hatfield found that the discretionary function exception applied under the facts, so he granted the government's motion of summary judgement. On appeal the 9th Circuit Court of Appeals found Judge Hatfield

was in error and reversed. *Marlys Bear Medicine v. United States ex rel. Secretary of Interior*, 241 F.3d 1208 (9th Cir. 2001). Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331. At trial Plaintiffs were represented by Monte Beck and Joe Bottomly. The United States was represented by George Darragh, Jr.

The BIA was negligent and breached its non-delegable and fiduciary duties to insure adequate safety precautions were taken during the course of the timber harvesting project which required inherently dangerous and extremely hazardous work. *See Bear Medicine, supra.* This negligence was the cause of the Kicking Woman's injuries. Plaintiffs are entitled to damages for survivorship, wrongful death and loss of consortium.

My determination is based upon the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. BIA Timber Contract

1. The Department of Interior, Bureau of Indian Affairs, is an agency of the United States of America. (Agreed Fact, Signed Pretrial Order 1/6/99).

2. The United States Government, through the BIA, has a trust and fiduciary relationship with the Blackfeet Tribe and its individual members, including Plaintiffs. This trust relationship involves the management and control of the harvest of Indian timber within the reservation. (Agreed Fact, Signed Pretrial Order 1/6/99).

3. On or about April 14, 1993, the BIA approved a timber contract entered into between Bailey Peterson, d/b/a Lone Bear Logging and the Blackfeet Tribe to harvest a certain section of timber within the exterior boundaries of the Blackfeet Reservation, commonly known as the St. Mary's Unit. (Agreed Fact, Signed Pretrial Order 1/6/99).

4. The BIA was aware that Blackfeet tribal members would be hired as sawyers under the contract between the BIA and Bailey Peterson d/b/a Lone Bear Logging. (Agreed Fact, Signed Pretrial Order 1/6/99).

5. On or about September 30, 1993, Bailey Peterson's employees were logging the St. Mary's Unit pursuant to the contract. (Agreed Fact, Signed Pretrial Order 1/6/99).

### B. Safety Issues and Duties

6. Under the timber contract the BIA retained the authority to ensure Lone Bear Logging's compliance with proper timbering practices.

7. The contract between the Blackfeet Tribe and Lone Bear contained a safety provision and reserved for the BIA the right to inspect and suspend Lone Bear's operation should it fail to comply with the contract. A BIA forestry technician inspected the site regularly.

8. Despite both the power to direct and supervise Lone Bear's operations and knowledge that proper safety precautions were not being taken, the BIA failed to take any action to protect Kicking Woman, a beneficiary of the trust.

9. The BIA Forest Manager, Bruce Connell, was aware that most loggers on the reservation were self-taught and had no formal training in logging safety. (Bruce Connell 1994 Deposition, p. 27).

10. The BIA, through its Forest Manager, Bruce Connell, was aware that most operators did not have resources to research appropriate

safety standards. (Bruce Connell 1998 Deposition, p. 42).

11. The BIA knew the timber harvesting operation in question was located in an area known for high and unpredictable winds. (Bruce Connell 1994 Deposition, pp. 12–13; Alexander Deposition, pp. 35–36; Middle Rider 1994 Deposition, pp. 5–6; Sienko Deposition p. 43).

12. BIA Forestry Technician Floyd Middle Rider had talked to his superior prior to the accident about implementing the wind closure policy. (Middle Rider 1998 Deposition, p. 10).

13. One of the reasons such a policy was not implemented was that the area was so windy that a closure policy would interfere with logging most of the time. (Middle Rider 1994 Deposition, p. 8).

14. Bruce Connell, BIA Forest Manager, agreed that this accident could have been avoided with prior training and safety precautions. (Bruce Connell 1994 Deposition, p. 25).

15. Bailey Peterson, d/b/a Lone Bear Logging, did not have any type of liability insurance or Workers' Compensation insurance at the time of Kicking Woman's injury.

16. Few, if any, members of the Lone Bear crew had been formally trained in basic safety procedures and none had been trained in first aid.

17. Lone Bear employees did not know basic safety standards.

18. The BIA was the only organization on the reservation with appropriate safety expertise and had virtually complete control of all timbering operations on Indian lands.

**C. The Accident**

19. Kicking Woman was at the logging site where the accident occurred to replace crew member Malcolm New Robe, a friend of Kicking Woman's who had been unable to work due to an injury received in a motor vehicle accident. (Malcolm New Robe 1998 Deposition, pp. 16–17, 35).

20. Malcolm New Robe and Leland Kicking Woman drove up to the logging site together on the morning of the accident for the purpose of starting Kicking Woman working on the site. Upon arrival, Bailey Peterson wasn't there, so they "checked in" with the crew foreman, Quinton New Robe. (Quinton New Robe 1998 Deposition, p. 20; Malcolm New Robe 1998 Deposition, pp. 20–21; Mittens 1998 Deposition, p. 27).

21. Bailey Peterson, Malcolm New Robe and others on the logging crew testified that Quinton New Robe was designated and authorized to run the crew in Bailey Peterson's absence. (Quinton New Robe 1994 Deposition, pp. 14–15; Malcolm New Robe 1998 Deposition, pp. 6–7; Mittens 1998 Deposition, pp. 8–9, 27).

22. Quinton New Robe told Malcolm New Robe to watch Kicking Woman cut down a few trees and then show him around the site. (Malcolm New Robe 1998 Deposition, pp. 19, 21, 36–7, 46; Quinton New Robe 1994 Deposition, p. 18).

23. After Malcolm New Robe watched Kicking Woman cut down several trees, he began showing him around the timber cutting site. (Malcolm New Robe 1998 Deposition, p. 20).

24. The "tryout" was perfunctory and included no safety training. (Malcolm New Robe 1998 Deposition, p. 20).

25. Kicking Woman was an untrained worker who had no safety training. Neither Kicking Woman or Malcolm New Robe had any safety training. (Malcolm New Robe 1998 Deposition, pp. 16–17, 35).

26. Although he had cut firewood, Kicking Woman had no experience as a professional logger. (Malcolm New Robe 1998 Deposition, pp. 15–16; Mittens 1998 Deposition, p. 22.)

27. Immediately before the accident, Malcolm New Robe took Kicking Woman just down the hill from where Quinton New Robe was falling a tree. (Malcolm New Robe 1998 Deposition, p. 21).

28. Quinton New Robe warned Malcolm New Robe to move from below him. Malcolm New Robe then directed Kicking Woman a short distance behind some trees. (Malcolm New Robe 1998 Deposition, p. 23).

29. Malcolm New Robe had never been trained regarding proper distances to stay from a faller, *i.e.* the two tree length rule. (Malcolm New Robe 1998 Deposition, p. 24).

30. Malcolm New Robe thought Kicking Woman was beyond the distance of a single length of tree, but was incorrect. (Malcolm New Robe 1998 Deposition, p. 24).

31. The tree Quinton New Robe was cutting fell in an unintended direction toward where Malcolm New Robe and Kicking Woman stood. (Quinton New Robe 1994 Deposition, p. 32; Malcolm New Robe 1998 Deposition, p. 25).

32. Kicking Woman saw the tree was falling toward him and Malcolm New Robe. Malcolm New Robe did not see the dangerous falling tree. Kicking Woman, at great risk to his personal interests, intervened to save Malcolm New Robe from injury or death. He saved New Robe from serious injury or death by pushing him out of the way of the falling hazard. (Malcolm New Robe 1998 Deposition, pp. 24, 40; Quinton New Robe 1994 Deposition, p. 38).

33. The falling tree struck Kicking Woman on the neck and upper shoulders.

34. The crew loaded Leland in his car and drove him to the Browning Hospital. There he was diagnosed with spinal cord injury at C6 and C7. He was rendered quadriplegic as direct result of being struck by the falling tree. A later stroke caused by Kicking Woman's quadriplegic medical complications further exacerbated his physical, emotional, social and spiritual well being.

## D. The Plaintiffs

35. Leland Kicking Woman, deceased, was a duly enrolled member of the Blackfeet Tribe, residing within the exterior boundaries of the Blackfeet Reservation. (Agreed Fact, Signed Pretrial Order 1/6/99).

36. Leland Kicking Woman was born April 6, 1961. He died June 26, 1994. He was 33 years old when he died.

37. George Kicking Woman and Molly Kicking Woman are Leland Kicking Woman's parents. (Agreed Fact, Signed Pretrial Order 1/6/99). George Kicking Woman is 90 years old. Molly Kicking Woman died in 2000. She was 80 years old. Both

Molly and George Kicking Woman depended on Leland Kicking Woman for physical, social, emotional, financial and spiritual support. He performed many tasks for them in each realm. Leland Kicking Woman's death was a significant loss to his elderly parents.

38. Delores Iron Shirt, an enrolled member of the Blackfeet Tribe, is the sister of Leland Kicking Woman, and co-personal representative of his Estate. (Agreed Fact, Signed Pretrial Order 1/6/99).

39. Marlys Bear Medicine, an enrolled member of the Blackfeet Tribe, was the wife of Leland Kicking Woman and co-personal representative of his Estate. She is the mother of Leland Kicking Woman's youngest children, Tanielle Kicking Woman and George Lee Kicking Woman, II, who are enrolled members of the Blackfeet Tribe. (Agreed Fact, Signed Pretrial Order 1/6/99).

40. Dana Wilson is the ex-wife of Leland Kicking Woman and is the mother and guardian of Leland Kicking Woman's older children, Brandi Kicking Woman, Susan Kicking Woman, Lissa Kicking Woman and Leland Kicking Woman, Jr. (Agreed Fact, Signed Pretrial Order 1/6/99).

## E. Damages

### a. Pain and Suffering

41. Leland Kicking Woman died as a result of complications of the injuries sustained in the logging accident, after nine months of medical care. (Signed Pretrial Order 1/6/99).

42. Leland Kicking Woman became a full-time resident of a nursing home after his accident. His medical records demonstrate he had numerous difficulties and suffered immensely from his injuries. He was readmitted into hospitals six different times because of complications caused by the quadriplegia and his consequent impairments.

43. Leland Kicking Woman was totally dependent on others for mobility, personal care and feeding. (Testimony of Dr. Holly Strong, 5 March, 2002; Testimony of Dr. Patrick Galvas, 5 March, 2002).

44. As a result of the quadriplegia Leland Kicking Woman was unable to move his left arm, his torso or either leg. Also as a result of the quadriplegia Leland suffered from continual muscular spasticity. The muscles running along his spine and lower back were in an almost constant state of painful spasm. The quadriplegia further caused a condition known as heterotopic ossification, which is when hard boney tissue forms in the soft tissue. (Testimony of Dr. Holly Strong, 5 March, 2002; Testimony of Dr. Dean Ross, 5 March, 2002). The heterotopic ossification presented a medical complication for Leland Kicking Woman's health care providers, and was a complication in his medical status. However, because he was quadriplegic there was no significant pain or suffering caused by heterotopic ossification. (Testimony of Dr. Dean Ross, 5 March, 2002).

45. On November 25, 1993, Leland Kicking Woman suffered a CVA, a complication of his quadriplegia and caused by his quadriplegia. (Testimony of Dr. Holly Strong, 5 March, 2002).

46. Any ability of Leland Kicking Woman to use his right arm was further impaired by the stroke. After the stroke he experienced increased fatigue, depression and difficulty speaking. While his cognitive abilities were significantly impaired, he was aware that his brain didn't function as it did before. This caused him anxiety, depression, and affected "his will to live." (Testimony of Dr. Holly Strong, 5 March, 2002).

47. Leland Kicking Woman suffered from recurring respiratory infections and bouts of pneumonia caused by the lack of muscle control in his chest wall. He had great difficulty swallowing and had a fear of choking. Due to the level of the neck injury, he underwent multiple bronchoscopes, a PEG procedure, and pulmonary toileting every day. He eventually had to have a tracheotomy. (Testimony of Dr. Holly Strong, 5 March, 2002).

48. Leland Kicking Woman had a catheter surgically placed for bladder drainage. He had a neurogenic bowel and bladder requiring daily management due to the lack of control and sensation. (Testimony of Dr. Holly Strong, 5 March, 2002; Testimony of Dr. Dean Ross, 5 March, 2002).

49. Leland Kicking Woman endured multiple pressure sores, seizures, weight loss, kidney failure, liver dysfunction, and had to rely on feeding tubes near the end of his life. (Testimony of Dr. Holly Strong, 5 March, 2002; Testimony of Dr. Patrick Galvas, 5 March, 2002; Testimony of Dr. Dean Ross, 5 March, 2002).

50. Leland Kicking Woman weighed 164 pounds on the date of the accident; by December 1993 he weighed 104 pounds, at death he weighed 122 pounds. (Testimony of Dr. Patrick Galvas, 5 March, 2002; Testimony of Dr. Dean Ross, 5 March, 2002).

51. Leland Kicking Woman suffered anxiety, depression, frustration, and continuous emotional strain as a result of his physical condition. (Testimony of Dr. Dean Ross, 5 March, 2002). Leland was a very active Native American athlete. He lived a life of virtue as that related to the balance in his life between excess and deficiency. His athleticism kept him involved in all aspects of sports, from participation to coaching to fan. His condition was not the result of any "wrong doing" on his part so he was atypical of many quadriplegic patients who are injured because of engaging in some wrongful conduct such as drinking and driving at the time of injury. These facts made his mental suffering, and his emotional suffering much worse than the typical person suffering quadriplegia from trauma. (Testimony of Dr. Dean Ross, 5 March, 2002).

52. Leland Kicking Woman unsuccessfully tried to rehabilitate himself through physical, occupational and speech therapy. (Testimony of Dr. Holly Strong, 5 March, 2002). The terror of being trapped in a useless body, complicated by the stroke, was exceedingly harsh for Leland Kicking Woman, a person who lived the freedom of his body and spiritual being in a way that allowed him to bask in the joy of health in the openness and vast expanse of the East Front of the Rocky Mountains near Browning. His injury killed his body and his spirit.

53. A videotape taken of Leland Kicking Woman on March 8, 1994, showed Kicking Woman attempting to feed himself with the help of an occupation therapist. Kicking Woman is also shown receiving physical therapy and speech therapy. The videotape illustrates the difficulties of a quadriplegic with a CVA complication.

54. Leland Kicking Woman died on June 26, 1994. The cause of death was probable cardiopulmonary arrest, most likely caused by an embolism. (Testimony of Dr. Dean Ross, 5 March, 2002)

55. Leland Kicking Woman suffered greatly before he died. I find that a reasonable award for Leland Kicking Woman's pain and suffering is $500,000.00. Had he lived a normal life expectancy, even for a quadriplegic, a reasonable amount for this element of damage would be significantly higher.

b. **Medical and Funeral Expenses**

56. Leland incurred reasonable medical bills in the amount of $540, 801.97. (Stipulation of parties filed September 25,1998).

57. Reasonable funeral expenses incurred were $6,295.00.

58. Defendant received notice of some of Leland Kicking Woman's medical bills, $485,078.83, on September 13th, 1995.

59. Defendant received further notice of final medical expenses ($540, 801.97) and funeral expenses ($6,295) on November 3, 1996.

60. A reasonable sum for special damages of medical expenses and funeral expenses is $547,096.97.

c. **Loss of Established Course of Living**

61. Leland Kicking Woman had been active in the Horn Society, which is a Blackfeet Association which requires its members to abide by a rigorous code of conduct. (George Kicking Woman Deposition, pp. 16–17).

62. Leland Kicking Woman was being tutored by his father, George Kicking Woman, to perform a number of sacred rituals on behalf of the Tribe. (George Kicking Woman Deposition, pp. 16–17).

63. Leland Kicking Woman had years of training to be a spiritual leader and the holder of the "Thunder Pipe Bundle." (Testimony of George Kicking Woman, 4 March, 2002; Testimony of Conrad LaFromboise, 4 March, 2002).

64. George Kicking Woman is a bundle holder in the Blackfeet Tribe who is entrusted with very important duties in the traditional culture. A bundle holder is a role model, spiritual guide and advisor to the members of the Tribe. He is entrusted with a number of ceremonies and duties for the benefit of the Tribe. The Thunder Pipe Bundle is probably over 400 years old. The pipe came down through Molly Kicking Woman's family and George Kicking Woman has been the holder for 53 years. Leland Kicking Woman's involvement in these cultural practices was very important to him, his parents, family, and the Tribe as a whole. (Testimony of George Kicking Woman, 4 March, 2002; Testimony of Conrad LaFromboise, 4 March, 2002).

65. Leland Kicking Woman had been groomed since his early teens to

replace George Kicking Woman as the Thunder Pipe Bundle holder. The loss of Leland Kicking Woman as a future leader of the tribe was a significant blow to Blackfeet cultural viability due to the years of training invested in him. Leland Kicking Woman had established a course of living that was unique and important to himself and his culture. (Testimony of George Kicking Woman, 4 March, 2002; Testimony of Conrad LaFromboise, 4 March, 2002).

66. Leland Kicking Woman was an avid athlete. Prior to the accident he was in excellent physical condition. Leland Kicking Woman was a star basketball player in high school and continued to play throughout his adult years. He frequently rode horses and went running. He also enjoyed other aspects of an outdoor life such as fishing and hunting. (Testimony of Dana Wilson, 4 March, 2002; Testimony of Marlys Bear Medicine, 4 March, 2002).

67. Leland Kicking Woman counseled children at youth camps, and recreated with his own family regularly. (Testimony of Marlys Bear Medicine, 4 March, 2002).

68. Leland Kicking Woman's established course of living was lost due to his quadriplegia and consequent complications. A reasonable sum for the loss of an established course of living caused by Leland Kicking Woman's quadriplegia is $750,000.00.

**d. Loss of Earning Capacity**

69. Leland Kicking Woman's primary steady vocational activity was managing and maintaining his elderly parents' family ranch and lease holdings. The ranch consisted of 320 acres of land from Molly's family and another 500 acres that belong to George. (Testimony of Merle Grant, 4 March, 2002; Testimony of George Kicking Woman, 4 March, 2002; Testimony of Melvin Iron Shirt, 4 March, 2002).

70. Leland Kicking Woman also worked as a carpenter remodeling and constructing houses for Melvin Iron Shirt, other contractors, and the Home Improvement Program in Browning. (Testimony of Melvin Iron Shirt, 4 March, 2002).

71. Leland Kicking Woman was a counselor at youth summer camps and coached youth sports. (Testimony of Marlys Bear Medicine, 4 March, 2002).

72. Leland Kicking Woman had work experience in cutting firewood, general maintenance, counseling children, as a machine operator on an assembly line, and as a cashier. (Testimony of Dana Wilson, 4 March, 2002; Testimony of Marlys Bear Medicine, 4 March, 2002). The place where Leland Kicking Woman lived, and the job market available to him is a factor to consider in attempting to calculate his loss of earning capacity. It is relevant to the extent that the record is bare of any evidence that he intended to leave the Browning area, or the Blackfeet Indian Reservation, Thus, in all likelihood he would have stayed in an area of part time or piece labor for the balance of his life. There is no proof that he ever had regular full time employment. He likely would have been a "pipe bearer" and subject to the demands of that spiritual role, including the need to stay

on the Blackfeet reservation to fulfill the charge of his calling. I find he would have cared for his family and provided for the needs of his family and the demands of his spiritual role, but that in so doing he would not have worked on a constant full time basis. These factors all are appropriate considerations in trying to project what his future earning capacity would have been.

73. Plaintiffs' expert Dan Schara testified that although there was scant earning information from tax returns, Leland Kicking Woman had a similar earning capacity to that of a carpenter, ranch foreman, laborer, fire fighter or potential logger. Schara conservatively estimated Leland Kicking Woman's pre-injury earning capacity to be $20,858.00 per year. Schara estimated Leland Kicking Woman's work-life expectancy to be 25.8 years, leading to a work-life loss of earning capacity of $538,136.40. I believe the methodology is reliable in this calculation but I do not think the assumptions are entirely valid. I believe Leland Kicking Woman's earning capacity is between $10,500.00 to $15,000.00 per year.

74. Defendant received notice of Leland Kicking Woman's lost earnings on November 3, 1996.

75. I find that a reasonable award for the loss of Leland Kicking Woman's earning capacity is $325,000.00.

### e. Loss of Household Services

76. Leland Kicking Woman was unable to perform any household services after his injury.

77. Leland Kicking Woman was a devoted father and son. He was skilled in light carpentry and construction. I find a reasonable sum for the loss of household services is $75,000.00.

### f. Loss of Consortium

### i. Spouse

78. Leland Kicking Woman was a dedicated family man. Leland Kicking Woman and his wife were very supportive of each other. Marlys Bear Medicine came to the hospital in Missoula almost daily. Health care providers testified Leland Kicking Woman ate well and responded better to therapy and treatment when Bear Medicine was present. Marlys Bear Medicine experienced severe grief and sorrow over Leland Kicking Woman's death. Marlys Bear Medicine was 27 years old when Leland Kicking Woman died.

### ii. Children

79. Leland Kicking Woman was also an active father with six children who ranged in age from three days old to twelve years old at the time of his death. Testimony at trial demonstrated that he was an involved parent who was an exemplary role model for his children. Trial testimony also demonstrated the hurt and emotional suffering of the children caused by his death.

80. Leland Kicking Woman was very close to all his children, and they relied on him for emotional and financial support. His children have suffered much grief, sorrow and difficulty from Leland's death.

81. Brandi Kicking Woman was born on October 28, 1981. She was 12 years old when her father died. She underwent counseling through both Heart Butte School and Blackfeet Community Hospital to

help her try to overcome the anguish cause by her father's death.

82. Susan Kicking Woman was born on December 26, 1982. She was 11 years old when her father died. She also underwent counseling at both the Heart Butte School and Blackfeet Community Hospital to help her through the grieving process.

83. Lissa Kicking Woman was born on May 26, 1985. She was 9 years old when her father died.

84. Leland Kicking Woman, Jr. was born on June 14, 1987. He was 7 years old when his father died.

85. Tanielle Kicking Woman was born on October 12, 1990. She was 3 years old when her father died.

86. George Lee Kicking Woman, II was born on June 23, 1994. He was 3 days old when his father died. He has been deprived of any relationship with his father.

### iii. Parents

87. Leland Kicking Woman was a devoted son who spent many hours with his elderly parents and ran their family ranch and lease holdings. Leland Kicking Woman was the person chosen to carry on the family's tradition of tribal and spiritual leadership.

88. Both Molly and George Kicking Woman underwent counseling with a psychologist to help them work through the tragic loss of their son.

89. Leland Kicking Woman's wife, children, and elderly parents have been deprived of the unique gifts, support, companionship and guidance that he could provide. The testimony from witnesses demonstrated the shock, depression and anxiety Leland's death caused his family. This testimony was in addition to those witnesses who testified regarding how the Plaintiffs have suffered from the loss of comfort, care, companionship and society Leland Kicking Woman provided. I find Leland Kicking Woman's family members should be compensated $925,000.00 for their wrongful death and loss of consortium claims.

### g. Prejudgment Interest

90. Plaintiffs are due no prejudgment interest.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction and Choice of Law

1. This case arises under the Federal Torts Claim Act. The FTCA provides that the United States is liable in tort in the same manner and to the same extent as a private person would be liable under like circumstances. United States District Courts have original jurisdiction to hear claims brought under the FTCA. *See Bear Medicine, supra.*

2. Montana law governs the tort issues in this case. *Bear Medicine,* 241 F.3d at 1218.

3. Montana law also controls the measure of damages which can be recovered from the United Stated under the FTCA. *United States v. Becker,* 378 F.2d 319 (9th Cir.1967); *Felder v. United States,* 543 F.2d 657 (9th Cir.1976).

### B. Breach of Fiduciary Duty

4. The BIA breached its fiduciary duty to ensure that basic safety requirements were communicated and used on the logging site in question.

5. "The BIA, with its 'pervasive' and 'comprehensive' control over the Blackfeet timbering operations had a duty to ensure that basic safety practices were communicated and then used at the logging site." *Bear Medicine*, 241 F.3d at 1219–20; *United States v. Mitchell*, 463 U.S. 206, 219, 222, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

6. The BIA breached this fiduciary duty when it failed to investigate the safety training or procedures of Lone Bear. Specifically, Lone Bear's crew did not stop logging during high winds and did not know proper standards for spacing workers and fallers on the work site.

## C. Non-delegable Duty

7. The BIA had a non-delegable duty to ensure that Lone Bear took adequate safety measures to protect those on the work site.

8. The Montana Supreme Court recently reaffirmed that "an employer is vicariously liable for injuries to others caused by a subcontractor's failure to take precautions to reduce the unreasonable risks associated with engaging in an inherently dangerous activity." *Bear Medicine*, 241 F.3d at 1218 (quoting *Beckman v. Butte–Silver Bow County*, 2000 MT 112, ¶ 24, 299 Mont. 389, ¶ 24, 1 P.3d 348, ¶ 24 (Mont.2000)).

9. Furthermore, Montana "imposes a non-delegable duty upon project owners to ensure that contractors performing inherently dangerous work employ proper safety precautions." *McCall v. U.S. Department of Energy*, 914 F.2d 191, 195 (9th Cir.1990).

10. The contract between the Blackfeet Tribe and Lone Bear, drafted by the BIA, mandated that prescribed safety practices be followed.

11. The BIA had a non-delegable duty as the owner of the project to ensure these safety practices were instituted.

## D. Inherently Dangerous Activity

12. The question in determining whether an activity is inherently dangerous is whether, "the proper use of safety precautions requires special knowledge and, when not followed or properly applied, may result in instantaneous death to the workers." *Bear Medicine*, 241 F.3d at 1218 (quoting *Beckman*, at ¶ 25).

13. Felling trees in an area plagued by powerful and dangerous winds is an inherently dangerous activity because of the high potential of death and injury to workers. *McMillan v. United States*, 112 F.3d 1040, 1047 (9th Cir.1997) (finding that logging trees with snags was an inherently dangerous activity because of the high potential of injury and death). When an activity is inherently dangerous, neither the owner, nor the contractor nor any agency with fiduciary duties concerning the activity may delegate the duty of safety to some other person or entity. The duty is non-delegable and that means that it stays where the law vests it, even if others in the chain of responsibility have a concomitant duty to ensure safety on the job site.

14. Felling timber requires special knowledge of specific safety measures which, if not properly followed, may result in injury or death. Such was the case here where the decedent was unaware of the special knowledge that could have saved his life. Safety is not common sense, it is a sophisticated

proposition that requires knowledge, education, guidance and equipment among other matters in achieving the goal of eliminating or reducing the risk of serous injury or death that is encompassed in the notion of duty as it exists for a fiduciary or for one involved in an inherently dangerous activity.

15. Therefore, the "use of untrained employees in a logging operation in a high wind area was an inherently dangerous activity that, under Montana law, imposed a non-delegable duty on the BIA to ensure Lone Bear took adequate safety measures on the site." *Bear Medicine*, 241 F.3d at 1218.

## E. Loss of Consortium of Adult Child

16. There is no case law in Montana directly addressing whether parents can recover for the loss of consortium of an adult child. However, this Court believes the Montana Supreme Court would adopt such a cause of action. The Montana Supreme Court has "recognized repeatedly [its] authority and responsibility for the continued development of the common law" in this area. *Keele*, 258 Mont. at 160, 852 P.2d at 576. Montana allows loss of consortium claims by a husband or wife whose spouse has been killed or injured. Montana also allows loss of consortium claims by a minor child or a parent whose minor child or parent has been killed or injured. *See Keele v. St. Vincent Hospital & Health Care*, 258 Mont. 158, 161, 852 P.2d 574, 576 (1993); *Dawson v. Hill & Hill Truck Lines*, 206 Mont. 325, 333, 671 P.2d

589, 594 (1983); *Pence v. Fox*, 248 Mont. 521, 527, 813 P.2d 429, 433 (1991). Allowing a loss of consortium claim for parents of adult children only furthers this development of the common law and is consistent with the purposes of the law recognized by the legislature of the State of Montana as interpreted by the Montana Supreme Court.

17. In extending parents' loss of consortium claim to adult children, I find the rationale of *Howard Frank, M.D., P.C. v. Superior Court*, 150 Ariz. 228, 722 P.2d 955 (1986) to be persuasive. There the Court reasoned parents should be able to recover for the loss of consortium of an adult child because the grief and sorrow of losing a child does not end when that child turns 18. The Montana Supreme Court has previously followed the rationale of the Arizona Supreme Court when extending loss of consortium claims. *See Keele*, 258 Mont. at 162, 852 P.2d at 577 (*citing Villareal v. State Department of Transportation*, 160 Ariz. 474, 774 P.2d 213 (1989), in extending claim for loss of parental consortium).

18. The Montana Supreme Court has established a policy to protect, support and foster the parent-child relationship in Montana. The Montana Supreme Court has explained that claims for loss of parent-child consortium result from impairment of the parent-child relationship. *Keele*, 258 Mont. at 163, 852 P.2d at 577. The loss of this relationship, not the arbitrary age of the individuals involved, determines whether a loss of consortium claim is appro-

priate. Once viewed in this manner, it is proof of the quality of the relationship that should logically govern the extent of any claim by a parent concerning their damages incurred by the death of their adult child. Common sense dictates that grief, sorrow, and distress occasioned by loss of a loved one can be no less severe to a parent who loses their son or daughter at age 18 rather than at age 12.

19. Additionally, the wrongful death statute, M.C.A. § 27–1–513, is not limited to minor children. Any "argument against extension of a filial consortium action to adults is premised upon an archaic and outmoded pecuniary theory of parental rights and fundamentally misapprehends the modern elements of consortium." *Howard Frank*, 150 Ariz. at 232, 722 P.2d at 958.

At its earliest stage, then, the action for loss of consortium was in fact an action for loss of services to which the master was entitled. Gradually, however, services became only one element of the action as the intangible elements of love, comfort and society emerged as the predominant focus of consortium actions ... Children are now valued for their society and companionship, and the true significance of a parent's action under modern practice is that it compensates the parents' emotional losses when their child is injured.

In striking contrast to the significant changes in spousal consortium actions, however, filial consortium actions continue to be haunted by the common law master-servant heritage despite parallel changes in social status and the death of the economic-services rationale ... It is irrelevant that parents are not entitled to the services of their adult children; they continue to enjoy a legitimate and predictable expectation of consortium beyond majority arising from the very bonds of the family relationship. Surely nature recoils from the suggestion that the society, companionship and love which compose filial consortium automatically fade upon emancipation; while common sense and experience teach that the elements of consortium can never be commanded against a child's will at any age.

 *Howard Frank*, 150 Ariz. at 232–233, 722 P.2d at 958–960.

20. I find Montana law supports, and the Montana Supreme Court would recognize, that Leland Kicking Woman's parents, spouse and children are all entitled to recover under a loss of consortium claim.

## F. Comparative Negligence

 21. Although the Montana Supreme Court has not specifically addressed the issue, it is consistent with existing Montana law to find that the defense of comparative negligence is unavailable in a claim for breach of fiduciary duty. The purpose of a fiduciary relationship would be completely undermined if a beneficiary's negligent conduct could be used by the fiduciary as a defense against the person he is supposed to protect, even though there is a nondelegable duty to protect that person. Such a holding is consistent with Montana case law that has held contributory negligence is inapplicable where the obligation scheme is intended for the protection of one class and expressly imposes the protective obligation on another. *See Steiner v. Department of*

*Highways,* 269 Mont. 270, 887 P.2d 1228 (1994); *Wilson v. Vukasin,* 277 Mont. 423, 922 P.2d 531 (1996); *Pollard v. Todd,* 148 Mont. 171, 418 P.2d 869 (1966).

22. Under the rescue doctrine, Leland Kicking Woman can not be held negligent, when, while saving the life of another, his act places him in harm's way. "It is not contributory negligence for a plaintiff to expose himself to danger in an effort to save himself or a third person .... from harm, unless the effort itself is an unreasonable one, or the plaintiff acts unreasonably in the course of it." Restatement (Second) of Torts § 472. "It may be reasonable for a plaintiff to take a very considerable risk in order to save a human life." Restatement (Second) of Torts § 472, comment a. There are no facts that support finding Leland Kicking Woman acted unreasonably when he saved Malcolm New Robe from certain injury or possible death.

23. Even if a comparative negligence claim was appropriate, there is no evidence to support the allegation Leland Kicking Woman acted negligently. Defendant's experts admitted that a young, inexperienced employee cannot be expected to be aware of hazards presented in timber falling or familiar with safe work practices. (Hymn Alexander Deposition, pp. 23–24). Defendant's experts further admitted that an inexperienced person cannot be expected to know safe logging practices without proper training. (*Id.*) There is no dispute Leland Kicking Woman was an inexperienced logger who had no safety training. Furthermore, Plaintiffs' experts were more credi-

ble on the issues they discussed than were Defendant's.

24. Additionally, Leland Kicking Woman was following the direction of Malcolm New Robe, the person the foreman had designated to show Kicking Woman around the job site. "The long-settled common law rule is that where an employee acts to obedience to a direct order of his principal or a vice-principal, he is not negligent unless the danger is so glaring and imminent that no reasonable person would incur it, even under orders." *Atchison, Topeka & Santa Fe Railway Co. v. Seamas,* 201 F.2d 140, 144 (9th Cir. 1952); *Jenkins v. Union Pacific Railroad Co.,* 22 F.3d 206 (9th Cir. 1994). It is undisputed Leland Kicking Woman was unaware of the "two tree length" rule which may have kept him from harm's way. Kicking Woman's lack of knowledge and reliance on others to tell him what to do prevented him from realizing any danger until it was too late.

25. There is no legal basis to find Leland Kicking Woman was contributory negligent. Furthermore, the facts I have found would not justify the imposition of any fault to him.

## G. Damages

26. Under Montana law, when a person's death is not instantaneous, and the person survives for an appreciable period of time after being injured, that person's estate may bring a survival action on his behalf for damages suffered by the decedent. The estate is entitled to recover the value of the decedent's reasonable

earnings after the date of death during the remainder of his life expectancy, as well as reasonable compensation for mental and physical pain and suffering in the interval between injury and death. *See Starkenburg v. State*, 282 Mont. 1, 24, 934 P.2d 1018 (1997).

27. Under Montana law, a decedent's personal representative may bring, in addition to a survival action, a wrongful death action on behalf of the decedent's heirs to recover "such damages ... as under all the circumstances may be just." M.C.A. § 27–1–323. Such damages include sorrow, mental distress, loss of affection and companionship, and loss of household services.

28. Loss of consortium damages are recoverable in wrongful death cases and are appropriate under the facts of this case. *Dawson v. Hill & Hill Truck Lines*, 206 Mont. 325, 671 P.2d 589 (1983).

29. Plaintiffs are not entitled to recover prejudgment interest on damages based on claims submitted prior to adjudication of the merits of this claim.

30. Under the wrongful death statute, survivors are allowed to recover damages for the grief and sorrow resulting from the death of the decedent. *See Dawson v. Hill & Hill Truck Lines*, 206 Mont. 325, 671 P.2d 589 (1983); *Ewalt v. Scott*, 206 Mont. 503, 675 P.2d 77 (1983). These damages for sorrow, mental distress or grief are an element of damages separate from loss of consortium. *Id.* Loss of consortium damages compensate the plaintiff for the loss of care, comfort, society and companionship of the decedent.

*Keele v. St. Vincent Hospital & Health Care*, 258 Mont. 158, 161, 852 P.2d 574, 576 (1993). Damages for grief and sorrow compensate the plaintiff for the mental anguish and anxiety which occurs as a result of the decedent's death. *Dawson*, 206 Mont. at 331, 671 P.2d at 593.

31. Montana law allows parents to recover grief and sorrow damages for the death of a minor child. *Dawson*, 206 Mont. at 333, 671 P.2d at 594. It is apparent then that minor children should be able to recover these damages for the death of a parent. Similarly, Montana law allows an adult child to recover grief and sorrow damages resulting from the death of a parent. *Ewalt*, 206 Mont. at 504, 675 P.2d at 77. Consequently, it cannot be disputed a parent should be able to recover these damages for the loss of an adult child, as the same relationship is involved.

32. Any finding of fact more properly considered a conclusion of law is hereby incorporated.

## IV. VERDICT

1. The BIA was negligent in breaching its fiduciary and nondelegable duties owed to the plaintiff.

2. The negligence and breach of duty by the BIA was the cause of the quadriplegia and ultimate death of Leland Kicking Woman.

3. Leland Kicking Woman was not contributory negligent.

4. The sum of $ 3,122,096.97 is awarded for the wrongful death, survivorship, and loss of consortium claims of the Plaintiffs caused by the death of Leland Kicking Woman.

The Clerk is directed to enter judgment, by separate document, in favor of Plaintiffs, and against the United States, in accordance with these Findings of Fact and Conclusions of Law.

The Clerk shall notify the parties of the entry of this Order and the Entry of Judgment in this case by serving on them copies of this Order and of the Judgment.