No. 04-073

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 47

TOM D. and SUZANNE M. HANSON,

Plaintiffs and Appellants,

v.

WATER SKI MANIA ESTATES, individually and collectively known as
Water Ski Mania Estates, a minor subdivision,

Defendant and Respondent.

APPEAL FROM:    District Court of the First Judicial District,
In and for the County of Lewis and Clark, Cause No. ADV 2002-264
The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Richard J. Pyfer, Doubek & Pyfer, Helena, Montana

For Respondent:

Holly J. Franz, Franz & Driscoll, Helena, Montana

Submitted on Briefs:  July 28, 2004

Decided:  March 1, 2005

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    Tom and Suzanne Hanson (Hansons) appeal the First Judicial District Court's grant of summary judgment to Water Ski Mania Estates.[1]  We affirm.

## ISSUES

¶2    A restatement of the issues is:

¶3    1.  Did the District Court err when it granted summary judgment?

¶4    2.  Did the District Court err when it determined that the Hansons "sold their property on the west end" of Serenity Lake?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5    In 1990, the Hansons bought approximately 80 acres of land in the Helena Valley near Helena, Montana.  On the eastern forty acres, they built a water ski lake, known as Serenity Lake, and established a five-lot minor subdivision named Water Ski Mania Estates (WSME).  In conjunction with the development of WSME, Tom Hanson (Tom) drafted restrictive covenants which were recorded on November 5, 1991.  These covenants, which expressly ran with the land, provided that no more than six landowners would be allowed to use Serenity Lake.  The pertinent covenant here stated:  "Five (5) landowners shall be owners of lots in Water Ski Mania Estates and one landowner shall be the owner of a single family dwelling built on property immediately west of the lake.[2]"  The parties have referred

---

[1]    Water Ski Mania Estates (WSME) was the named Defendant but the actual opponents to the Hansons' requested relief are Brian and Linda Heeney, owners of one of the WSME lots. This Opinion will refer to the Heeneys, rather than WSME, when appropriate.

[2]  Hansons subsequently sold the western forty acres to two individuals.  Neither of these individuals nor the land they purchased are a part of the case before us.  Tom testified, however,

to the single landowner who was to build on the west shore of the Lake as "the sixth landowner."

¶6    Hansons initially lived on Lot 1 and sold Lots 2 through 5 between 1991 and 1994. Thus, for the first few years, only five landowners used the Lake.  In 1996, Hansons decided to sell Lot 1 and begin building a new home.  Tom testified that originally they had intended to build on the west side of Serenity Lake as "the sixth landowner", but changed their minds and decided to build on the southern end of the Lake instead.  He explained that after the covenants were recorded, circumstances led him to build his boat dock on the southeast shore of the Lake.  Once the dock was in place, the Hansons wanted their home near it. They determined that while they had retained sufficient property on the west side of the Lake to build the house there, it would be too close to the home built by one of the buyers of the western half of the land, and too far from their dock.

¶7    As a result of the proposed sale of Lot 1 and the intended location change of the site for their home, Tom called a meeting of all WSME lot owners.  At the meeting he asked the landowners for their thoughts regarding the proposed re-location of his house.  Most of the property owners approved of the change.  The Heeneys, with whom the Hansons had previous disputes, requested that the commercial ski usage on the Lake be reduced to accommodate a sixth landowner.  Tom indicated he did not think that the covenants required that but "as a conciliatory measure," he would reduce the ski school usage from twenty to

that the Hansons retained a small parcel of land along the southwestern edge of Serenity Lake on which they could have built their home.

3

sixteen hours per week. The Heeneys then gave their consent to Hansons' decision to build their home on the south side of the Lake. As a result of the Heeneys' request at the 1996 meeting, Hansons reduced the ski school hours from 1996 through 2000 but in 2001, a ski school policy statement indicated that the ski school hours would be 21 hours per week.

¶8 At some time after the 1996 meeting, four of the WSME landowners filed an amendment to the restrictive covenants to specify that the Hansons were the sixth landowners with lake use rights. In 2000, the Heeneys filed suit against these landowners, challenging the amendment. The landowners subsequently withdrew the amendment and the action between the Heeneys and the remaining WSME landowners was dismissed voluntarily and without prejudice. The amendment to the covenants was deemed void.

¶9 Subsequently, in these proceedings, these same four WSME landowners filed affidavits indicating that at the time they purchased their property, they understood that the Hansons were the "sixth landowner" referenced in the restrictive covenants, and that they approved the re-location of the Hansons' home from the west side to the south side of Serenity Lake. The Heeneys did not file such an affidavit.

¶10 The Hansons completed their home on the south side of Serenity Lake in 2002. In April 2002, they filed this action, seeking a judgment declaring that under the restrictive covenants, they, as the sixth landowner, have the right to use Serenity Lake. The Heeneys appeared and opposed the request for declaratory relief. Ultimately, the Heeneys moved for summary judgment. In December 2003, the District Court granted their motion, concluding that the restrictive covenants precluded the Hansons from using the Lake. The court

determined that the statute of frauds applied to the restrictive covenants, and that they could be amended only by way of written instrument or by an executed oral agreement. It further concluded that neither an alleged oral agreement or the doctrine of equitable estoppel would take the matter out of the statute of frauds' application. Finally, pertinent to the second issue raised by Hansons, the court stated in its decision that the Hansons "sold their property on the west end" of Serenity Lake. The Hansons filed a timely appeal.

**STANDARD OF REVIEW**

¶11 Our standard of review of appeals from summary judgment is *de novo*. We apply the same criteria applied by the district court pursuant to Rule 56(c), M.R.Civ.P. The moving party must establish both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. Once the moving party has met its burden, the opposing party must present material and substantial evidence, rather than mere conclusory or speculative statements, to raise a genuine issue of material fact. We review a district court's conclusions of law to determine whether the court's conclusions of law are correct. *Fair Play Missoula v. City of Missoula*, 2002 MT 179, ¶ 12, 311 Mont. 22, ¶ 12, 52 P.3d 926, ¶ 12 (citing *Enger v. City of Missoula*, 2001 MT 142, ¶ 10, 306 Mont. 28, ¶ 10, 29 P.3d 514, ¶ 10).

**DISCUSSION**

¶12    Hansons argue that the District Court erroneously granted summary judgment in light of the existence of genuine issues of material fact. Hansons claim that they did not transfer their sixth landowner use right to the buyers of the western forty acres, as alleged by the Heeneys. They claim, therefore, that this is a material fact in dispute. Hansons also maintain that they established the sixth landowner use right for themselves in the restrictive covenants, and that they subsequently obtained oral agreement from all WSME members to allow them to use their right on the south rather than the west side of the Lake. Hansons assert that because the Heeneys disagree, the facts need to be resolved by way of trial.

¶13    We note initially that while the District Court stated in its Order that Hansons "sold their property on the west end," this was neither a legal finding nor a legal conclusion, and it is not dispositive of Hansons' property ownership. If, as argued by Hansons, they retained land on the west side of Serenity Lake and choose to build a single family dwelling there in accordance with the WSME covenants, nothing in the District Court's Order of Summary Judgment precludes them from doing so.

¶14    As to the Hansons' argument that they established themselves as the sixth landowner in the covenants and that they obtained oral agreement from the WSME landowners to move the location of their home, the District Court concluded that "Section VI(f) . . . of the covenants clearly provides that the sixth lake use right belongs to the owner of property west of the Lake, rather than specifically to the Hansons. There also is no provision in the covenants for transferring a lake use right from one piece of property to another. [The

6

Heeneys] correctly argue that because the language is clear and unambiguous, the Court must apply the language as written and cannot resort to extrinsic evidence of the intent of the parties."

¶15 We conclude the District Court correctly analyzed the written covenants. Regardless of the Hansons' intent at the time the covenants were written and executed, the Hansons are not identified as the sixth landowner. We construe restrictive covenants under the same rules as are applied to contracts. *Windemere Homeowners Ass'n Inc. v. McCue*, 1999 MT 292, 297 Mont. 77, 990 P.2d 769. When the language of a contract is clear and unambiguous, the language alone controls and there is nothing for the court to construe or interpret. *Morning Star Enterprises v. R. H. Grover* (1991), 247 Mont. 105, 111, 805 P.2d 553, 557.

¶16 Moreover, as determined by the District Court, under the covenants there is no method by which the sixth landowner lake use rights expressly granted to a parcel of "property immediately west of the lake" could be transferred to a parcel of property on the south end of the Lake. The covenants provide that the rights and obligations thereunder are to run with land for a specified amount of time "unless an instrument signed by majority of the landowners of the lots has been recorded, agreeing to change said covenants in whole or part." It is undisputed that no such instrument has been filed with the Clerk and Recorder of Lewis and Clark County.

¶17 Section 28-2-903, MCA, provides:

> (1) The following agreements are invalid unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged or his agent:

7

. . .

    (d)  an agreement . . . for the sale of real property or of an interest therein.

¶18    The Heeneys argued, and the District Court agreed, that the right to use the Lake was a right that, under the express language of the covenants, ran with the land, and therefore was an interest in real property. As a result, under the statute of frauds, any transfer of this right from one parcel to another had to be in writing. See *Silva v. McGuinness* (1980), 189 Mont. 252, 615 P.2d 879 (The right to a roadway granted in sales agreements is an interest in real property and an oral agreement to change the exit of the roadway is barred by the statute of frauds). *See also* § 70-17-101, MCA. The court concluded, and the parties did not dispute, that no such written transfer occurred.

¶19    The court also recognized, however, that under § 28-2-1602, MCA, "a contract in writing may be altered . . . by an executed oral agreement . . . ." Therefore, the District Court analyzed whether the purported oral agreements between the Hansons and the WSME landowners had been fully executed.

¶20    It is well established that the essential elements of a contract, whether written or oral, are: 1) identifiable parties capable of contracting; 2) consent of these parties; 3) a lawful object; and 4) sufficient cause or consideration. Section 28-2-102, MCA. The District Court concluded that there was no evidence of consideration given to the landowners for the covenant modification and as a result, the modification benefitted the Hansons only. Without consideration, there can be no oral contract. Without an oral contract, there can be no executed oral contract. The District Court's conclusion that consideration was absent is

8

supported by the record. Moreover, the Hansons' brief on appeal does not specifically challenge this finding; rather, they focus in their appeal upon the District Court's conclusion that equitable estoppel does not apply.

¶21 The Hansons maintain that because they relied on oral agreements with the WSME landowners and re-located their home as a result of these agreements, the Heeneys should be equitably estopped from denying them their sixth landowner lake use right, now that the home has been completed. However, as correctly noted by the District Court, "where a case is clearly within the statute of frauds, equitable estoppel is inapplicable, except in situations when the statute would otherwise operate to perpetuate a fraud." *Austin v. Cash* (1995), 274 Mont. 54, 62, 906 P.2d 669, 674. This exception has no application here.

¶22 For the foregoing reasons, we conclude that the District Court did not err in granting summary judgment.

## CONCLUSION

¶23 Affirmed.

/S/ PATRICIA O. COTTER

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER

/S/ JAMES C. NELSON