No. 04-643

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 301

ARDELL HERN, as Personal Representative
of the Estate of BECKY J. HERN, Deceased,
ARDELL HERN, in her Individual Capacity
and ROBERT HERN, in his Individual Capacity,

        Plaintiffs and Respondents,

    v.

SAFECO INSURANCE COMPANY OF ILLINOIS,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
                    In and for the County of Lake, Cause No. DV 02-04
                    The Honorable C.B. McNeil, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                John W. Bohyer, Esq., Tammy Wyatt-Shaw, Esq.,
                Timothy S. Peck, Esq., Phillips & Bohyer, P.C., Missoula, Montana;
                Jacqueline T. Lenmark, Esq.,       Thomas Q. Johnson, Esq.,
                Keller, Reynolds, Drake, Johnson & Gillespie, P.C., Helena, Montana

        For Respondents:

                Joe Bottomly, Esq., Jeffrey D. Ellingson, Esq., Amy Eddy, Esq.
                Bottomly & Ellingson, PLLP, Kalispell, Montana

                              Submitted on Briefs:  May 11, 2005

                                   Decided:  November 29, 2005

Filed:

                                      Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Safeco Insurance Company of Illinois (Safeco) appeals multiple issues arising out of a civil jury trial held in the Twentieth Judicial District, Lake County.  We affirm in part and reverse in part.

**ISSUES**

¶2     A restatement of the issues on appeal is:

¶3      Did the District Court err in granting the Herns' combined Motion for Summary Judgment and Motion to Strike Affirmative Defenses and in denying Safeco's Motion for Summary Judgment?

¶4     Did the District Court abuse its discretion by instructing the jury to award compensation to the estate of Becky Hern for the value of household services performed by Becky and for the loss of Becky's ability to pursue an established course of life?

¶5     Did the District Court abuse its discretion by instructing the jury on loss of consortium damages?

¶6     Did the District Court abuse its discretion by permitting the jury to apportion damages under a "special verdict" form?

¶7     Did the District Court err in awarding the Plaintiffs damages in excess of the $2,000,000 (two million dollar) policy limit through the addition of interest?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶8 Becky Hern (Becky), the daughter of Ardell and Robert Hern (Herns), was killed in a motorcycle accident in June 1992. The motorcycle was driven by her uninsured fiancee. Becky, who was living with her parents at the time of her death, had an automobile insurance policy with American Economy Insurance Company (American Economy) that provided $300,000.00 uninsured motorist (UM) coverage. The Herns also carried a multi-car automobile insurance policy with Safeco, which insured four of their vehicles. The Safeco policy had a $500,000.00 UM limit per vehicle.

¶9 In March 1993, Ardell Hern, acting individually, as Personal Representative of the Estate of Becky Hern, and on behalf of the heirs, together with Robert Hern and Becky's sister, Lisa Hern, entered into a structured cash settlement with Safeco and American Economy valued at approximately $355,398.00.[1] Prior to settlement, Safeco took the position that the multi-car policy purchased by the Herns provided a maximum of $500,000.00 UM coverage. Had the Herns been able to "stack" the UM coverage provided for each of their four vehicles, the maximum UM coverage would have been $2,000,000.00.

¶10 In 1997, several Safeco and American Economy insureds, including Steven Seltzer, filed a class action suit against these and other insurance carriers. The claimants argued that Safeco charged them multiple premiums for providing UM coverage on multiple vehicles but

---

[1]    At the time of settlement, American Economy paid $93,750.00 to the Herns, and Safeco paid $21,648.00. Subsequently, Safeco was to pay $1,000.00 per month from April 1993 through March 2013. The present value of the settlement was estimated to be approximately $250,000.00.

had no intention of providing coverage beyond that afforded to a single vehicle. In other words, they maintained that Safeco had taken the same position with the class action claimants as it had with the Herns.

¶11 In August 2001, the parties to the class action entered into a Settlement Agreement and Stipulated Judgment (*Seltzer* Settlement or Settlement). As a result of the *Seltzer* Settlement, insureds who purchased UM coverage for multiple cars, but whose claims were negotiated under the premise that only a single UM coverage applied, were able to have their claims reopened and readjusted. The district court defined the certified class action members as:

> All Montana citizens who, prior to May 2, 1997, were insured by Safeco Insurance Company of Illinois [other insurers omitted] for uninsured motorist (UM) coverage and the named insured paid premiums on more than one vehicle under the same policy.

¶12 Under the terms of the Settlement, the insurers were required to identify and notify the class members. The notification informed them that "if a class member was injured in an accident involving an uninsured motorist, and it is believed that the damages are in excess of the policy's UM limits for a single vehicle, and, further, if the class member wishes to have the claim reexamined," he or she could obtain a proof of claim form, complete it and submit it to the insurer. If the claim was submitted within the time required, the insurers, including Safeco, were required to reopen the claim and readjust it on the premise that the multiple UM coverages were capable of being stacked. If the claimant was subsequently dissatisfied with the readjustment, he or she could pursue legal action against the insurer.

4

¶13     Upon receipt of their notice of class member status, the Herns completed the necessary paperwork and submitted a claim for readjustment.  Safeco denied the claim, presumably on the basis that the value of the Herns' claim was below the one policy limit of $500,000.00.  After the Herns were notified that Safeco had denied their claim, and in accordance with the *Seltzer* Settlement terms, the Herns filed the instant action against Safeco, seeking full recovery of their damages.

¶14     The Herns filed a combined Motion for Summary Judgment and Motion to Strike Affirmative Defenses in the District Court.  The Herns sought to preclude Safeco from asserting the defenses of  "statute of limitations," "accord and satisfaction," and "payment and release"--affirmative defenses Safeco had preserved for future use, should they be appropriate, by declaring them in its Answer to the Herns' Complaint.  Safeco had also included "estoppel," "*res judicata*," and "waiver" in its preserved list of defenses.  Safeco subsequently filed a Cross-Motion for Summary Judgement seeking an Order that the Herns were barred from relitigating the wrongful death/survivorship action.  The parties agreed that there were no genuine issues of material fact relevant to these motions, and that they were amenable to summary judgment.  The District Court granted the Herns' Motion, allowing their litigation to go forward, and denied Safeco's Motion.

¶15     A jury trial was held from June 14-16, 2004.  The jury determined that the Herns' damages totaled $3,810,034.10.  Using a Special Verdict form that had been tendered by the Herns, the jury apportioned the damages as follows:

Damages for the Estate of Becky Hern

5

| | | |
|---|---|---|
| 1. | Loss of earning capacity of Becky Hern | $ 883,000.00 |
| 2. | Pain and suffering experienced by Becky Hern | 35,000.00 |
| 3. | Value of household services performed by Becky Hern | 140,000.00 |
| 4. | Loss of established course of life for Becky Hern | $1,500,000.00 |

Wrongful Death and Emotional Distress Damages for [Robert] and Ardell Hern

| | | | |
|---|---|---|---|
| 1. | Loss of society, comfort care, and companionship | | |
| | | [Robert] | $ 200,000.00 |
| | | Ardell | 300,000.00 |
| 2. | Grief, sorrow and mental anguish | | |
| | | [Robert] | 300,000.00 |
| | | Ardell | 450,000.00 |
| 3. | Funeral and Burial Expenses | | 2,034.10 |
| | | Total | $3,810,034.10 |

¶16 After the jury returned its verdict, which exceeded $3.8 million, the District Court entered its judgment, reducing the award to $2 million, representing the amount of money available under the four stacked policies. Subsequently, on July 28, 2004, the District Court entered an Amended Judgment. In the Amended Judgment, the District Court expressly acknowledged that Safeco had already paid the Herns $156,250.00 in UM benefits. The court therefore subtracted that amount from the $2,000,000 owed by Safeco thereby reducing the Herns' recovery to $1,843,750.00. The District Court also noted that the *Seltzer* Settlement imposed an obligation on Safeco to pay interest at 10% per year on a claim from the date it was originally adjusted and closed to the date of payment of the reopened claim. The court calculated that such interest on the Herns' claim from February 1993 to June 16, 2004, was $2,085,710.62. The District Court added this interest calculation plus the $1,406.71 stipulated costs of the Herns' lawsuit to the balance of the UM benefits owed to the Herns. The court then ordered Safeco to pay the total amount of $3,930,867.33.

6

¶17    Safeco appeals the District Court's denial of its Motion for Summary Judgment, the use of the special verdict form and the instructions to the jury regarding the type of damages to be awarded, and the court's imposition of prejudgment interest.

**STANDARDS OF REVIEW**

¶18    Our standard of review of appeals from summary judgment is *de novo*. We apply the same criteria applied by the district court pursuant to Rule 56(c), M.R.Civ.P. The moving party must establish both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. Once the moving party has met its burden, the opposing party must present material and substantial evidence, rather than mere conclusory or speculative statements, to raise a genuine issue of material fact. We review a district court's conclusions of law to determine whether the court's conclusions of law are correct. *Hanson v. Water Ski Mania Estates*, 2005 MT 47, ¶ 11, 326 Mont. 154, ¶ 11, 108 P.3d 481, ¶ 11 (citations omitted).

¶19    A district court has discretion regarding the instructions it gives or refuses to give to a jury and we will not reverse a district court on the basis of its instructions absent an abuse of discretion. In reviewing whether a particular jury instruction was properly given or refused, we consider the instruction in its entirety, as well as in connection with the other instructions given and with the evidence introduced at trial. The party assigning error to a district court's instruction must show prejudice in order to prevail, and prejudice will not be found if the jury instructions in their entirety state the applicable law of the case. *Kiely*

7

*Const., L.L.C. v. City of Red Lodge*, 2002 MT 241, ¶ 62, 312 Mont. 52, ¶ 62, 57 P.3d 836, ¶ 62 (internal citations omitted).

¶20     We also review the trial court's usage of a special verdict form for an abuse of discretion. "[O]ur ordinary standard of review of a discretionary trial court ruling, including the use of a special verdict form, is whether the court abused its discretion." *Ele v. Ehnes*, 2003 MT 131, ¶ 18, 316 Mont. 69, ¶ 18, 68 P.3d 835, ¶ 18 (citation omitted).

¶21     Lastly, a district court's award of prejudgment interest is a question of law which we examine for correctness. *Semenza v. Bowman* (1994), 268 Mont. 118, 127, 885 P.2d 451, 456.

## DISCUSSION

¶22     *1. Did the District Court err in granting the Herns' combined Motion for Summary Judgment and Motion to Strike Affirmative Defenses and in denying Safeco's Motion for Summary Judgment?*

¶23     Safeco asserts that "[t]he first and most critical string of errors committed by the district court was its decision to grant the Herns' motion to strike SAFECO's affirmative defenses of estoppel and *res judicata* and to deny SAFECO's motion for summary judgment." Safeco argues that the District Court's decision to grant the Herns' Motion to Strike led it to erroneously deny Safeco's Motion for Summary Judgment and grant the Herns' Motion for Summary Judgment. Safeco further maintains that the *Seltzer* Settlement expressly allowed Safeco "the right to assert all applicable defenses," and that the District Court "simply ignored the plain language of the *Seltzer* agreement."

¶24 The District Court's Order granting the Herns' Motion for Summary Judgment and Motion to Strike Affirmative Defenses did not expressly address the Herns' request that certain affirmative defenses be struck. The Order concentrated instead on the factors supporting the Herns' right to summary judgment. The court noted that the *Seltzer* Settlement clearly allowed members of the certified class to reopen their claims. The District Court further observed that Safeco conceded that the Herns were class members. Addressing Safeco's argument that the Herns were "not injured," the court disagreed, explaining that Safeco's narrow definition of "injury" to mean "bodily injury" only, was not in keeping with the legal definition of "injury" used in the law of damages. The court reasoned that the legal definition of "injury" encompasses physical injury as well as "any wrong or damage done to another, either in his person, rights, reputation or property." The court further noted that §§ 27-1-501, -512, and -513, MCA, recognize a right of a decedent's heirs to recover damages for the wrongful death of their child, including grief and sorrow. The court concluded, therefore, that the Herns were class members who were injured, thus entitling them to relitigate their wrongful death claims. On this basis, the District Court granted the Herns' combined Motion for Summary Judgment and Motion to Strike Affirmative Defenses, and denied Safeco's Cross-Motion.

¶25 As indicated above, summary judgment is proper only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P. The first prong of this test has been met--the parties and the District Court correctly concluded that no genuine issues of material fact relevant to these motions existed.

9

¶26 We also conclude that the District Court's legal analysis and conclusion were correct. Safeco conceded that the Herns were members of the class. Also, as the District Court correctly determined, the Herns were "injured." As a result of being "injured class members," under the express terms of the *Seltzer* Settlement they were entitled by law to have their claims reopened, and litigate in the event they were dissatisfied with Safeco's readjustment after reopening.

¶27 As to the affirmative defenses, we note that the Order, without explanation, granted the Herns' request to strike the defenses of "statute of limitations," "accord and satisfaction," and "payment and release." No reference was made, however, to Safeco's affirmative defenses of estoppel and *res judicata*; thus, those defenses were not actually struck from Safeco's Answer.

¶28 It is also noteworthy that Safeco did not raise these defenses either in response to Herns' Motion for Summary Judgment or in support of its own cross-motion; therefore, the defenses were waived for purposes of summary judgment. This omission both justifies the District Court's actions, and makes sense. In light of the provisions of the *Seltzer* Agreement, which expressly allowed previously settled claims to be reopened and relitigated, the defenses of estoppel and *res judicata* simply have no application.

¶29 Based on the foregoing, and because the District Court's rationale in granting summary judgment to the Herns was correct, we conclude the District Court did not err in denying summary judgment to Safeco or in granting summary judgment to the Herns.

10

¶30 *2. Did the District Court abuse its discretion by instructing the jury to award compensation to the estate of Becky Hern for the value of household services performed by Becky and for the loss of Becky's ability to pursue an established course of life?*

¶31 Safeco argues that the District Court abused its discretion by giving a jury instruction that permitted the jury to award damages to the estate of Becky Hern for: 1) the loss of Becky Hern's ability to pursue an established course of life after the date of death and throughout the remainder of her life expectancy, and 2) the loss of Becky Hern's capacity to perform personal and household services after the date of death during the remainder of her life expectancy. Safeco asserts that Montana law does not allow these damages in a survival action because they are not damages suffered by Becky Hern. Safeco maintains that the court erroneously combined the elements of damage available in personal injury and wrongful death actions with those available in a survival action.

¶32 The Herns counter that damages recoverable in a survivorship action are identical to those available in a personal injury action and therefore it was not an abuse of the court's discretion to instruct the jury accordingly. They further note that they did not seek economic compensation for these particular losses in their wrongful death action, so there was no duplication of compensation.

¶33 We begin our analysis by briefly distinguishing the causes of action available in Montana to the survivors of a decedent whose death is caused by the negligence of another-- *i.e.*, survival and wrongful death. (For a detailed analysis of these causes of action, see

11

*Swanson v. Champion Intern. Corp.* (1982), 197 Mont. 509, 646 P.2d 1166, and *Payne v.*

*Eighth Judicial Dist. Court*, 2002 MT 313, 313 Mont. 118, 60 P.3d 469.)

¶34    A "survival" action arises from § 27-1-501, MCA, which states in relevant part:

> An action, cause of action, . . . does not abate because of the death or disability of a party . . . but whenever the cause of action or defense arose in favor of such party prior to his death or disability . . ., it survives and may be maintained by his representatives or successors in interest.

¶35    A survival action raises claims that came into existence while the decedent was still

alive. These claims survive his or her death, and the cause may be pursued against the

responsible party by the decedent's personal representative. Section 72-3-604, MCA. The

damages that may be recovered in a survival action include lost earnings from the time of

injury to death, the present value of reasonable earnings during the decedent's remaining life

expectancy, medical and funeral expenses, reasonable compensation for pain and suffering,

and other special damages. *Swanson*, 197 Mont. at 515, 646 P.2d at 1169 (citations omitted).

The source of the damages recoverable in the survival action are personal to the decedent and

do not include damages suffered by the decedent's spouse, children or other heirs. *Swanson*,

197 Mont. at 515, 646 P.2d at 1169 (citations omitted).

¶36    Section 27-1-513, MCA, creates a cause of action for wrongful death. Damages for

wrongful death are non-specific and § 27-1-323, MCA, provides that "damages may be given

as under all the circumstances of the case may be just." Generally, damages under a

wrongful death claim will include loss of consortium by a spouse, loss of comfort and society

of the decedent suffered by the surviving heirs, and the reasonable value of the contributions

12

in money that the decedent would reasonably have made for the support, education, training and care of the heirs had she lived. *Swanson*, 197 Mont. at 517, 646 P.2d at1170 (citations omitted). Otherwise stated, survival damages are personal to the decedent but are pursued by her personal representative, while wrongful death damages are personal to those who survive her.

¶37 Safeco alleges the jury was wrongly instructed on these damages. First, Safeco asserts that the jury instruction used by the District Court to permit a damage award to Becky's estate for Becky's lost ability to pursue an established course of life, Montana Pattern Jury Instruction (MPI) 25.07, is specifically a "personal injury" instruction addressing a "plaintiff" who has been permanently injured, as opposed to a "decedent." Safeco maintains that this instruction is inappropriate to a survivor claim.

¶38 Analysis of relevant case law reveals that "loss of established course of life" damages are unique to Montana, and that in all reported cases--which include dozens of Montana state and federal court cases--these damages have been confined to personal injury as opposed to survivor claims. *See, e.g.*, *Henricksen v. State*, 2004 MT 20, ¶ 76, 319 Mont. 307, ¶ 76, 84 P.3d 38, ¶ 76 (A plaintiff is "entitled to recover, in the case of permanent injuries, a reasonable compensation for the destruction of his capacity to pursue an established course of life." )(citation omitted); *Callihan v. Burlington Northern Inc.* (1982), 201 Mont. 350, 358, 654 P.2d 972, 977 ("The record shows plaintiff's life largely consists of experiencing intractable pain. Plaintiff cannot participate in the outdoor activities which he loved. He can

no longer be an active, productive member of his family. Nor is he able to enjoy a physical relationship with his wife."). *See also Magart v. Schank*, 2000 MT 279, 302 Mont. 151, 13 P.3d 390; *Anderson v. Werner Enterprisess., Inc.*, 1998 MT 333, 292 Mont. 284, 972 P.2d 806.

¶39 The rationale for limiting this species of damages to personal injury claims was succinctly expressed in *Oberson v. U.S.* (D. Mont. 2004), 311 F.Supp.2d 917, 961, "When the plaintiff has been permanently injured and where he will continue to suffer in the future from his injuries, reasonable compensation for the loss of an established course of life is a proper element of damage." In other words, loss of established course of life damages are intended to compensate for an injured person's loss of what she once had, and the accompanying realization that she will live the rest of her life without ever recovering her previous course of life. We therefore agree with Safeco, and conclude that damages of loss of established course of living are not recoverable in survivor actions. Therefore, we conclude the District Court incorrectly instructed the jury that it could award loss of established course of life damages in this survivor action.

¶40 Additionally, Safeco asserts that compensation for lost household services is a legitimate damage available in a personal injury claim under MPI 25.04, or a wrongful death action under MPI 25.20, but it is not appropriate for a survivor action. Technically, Safeco is correct. Nonetheless, we conclude for the reason set forth below that it was not an abuse of the District Court's discretion to include such a damage instruction in the survivor action.

14

¶41    In 1987, the Legislature amended § 27-1-501, MCA, to require that "actions brought under this section and 27-1-513 must be combined in one legal action, and any element of damages may be recovered only once." The primary purpose of this change was to prohibit double recovery in wrongful death and survivor actions. *Payne*, ¶ 14. In the case before us, it is significant that the Herns, though entitled, did not seek to recover the value of household services performed by Becky as part of their wrongful death claim. As a result, there was no impermissible double recovery of these damages. Moreover, the damages awarded to the Herns are within the range of damages to which they were entitled. We conclude that the inclusion of the value of household services in the survivor action rather than the wrongful death action, while technically erroneous, does not constitute an abuse of discretion under these circumstances. We caution, however, that in the future, damages available in wrongful death actions should be included in the wrongful death portion of the verdict form.

¶42    *3. Did the District Court abuse its discretion by instructing the jury on loss of consortium damages?*

¶43    The parties disagree as to which damage awards constitute the "loss of consortium" award. Safeco asserts that the jury's award of $750,000.00, ($300,000.00 to Robert and $450,000.00 to Ardell) designated on the verdict form as "grief, sorrow and mental anguish," constituted an erroneous "loss of consortium" award. The Herns argue that the $200,000.00 awarded to Robert and the $300,000.00 awarded to Ardell for "loss of society, comfort care, and companionship" represented the "loss of consortium" damages, and were correctly awarded.

15

¶44    Filial "consortium" is defined in *Black's Law Dictionary* 304 (7th ed. 1999), as "a child's society, affection, and companionship given to a parent."  Moreover, our cases have repeatedly utilized these same terms when describing loss of consortium damages.  In *Pence v. Fox* (1991), 248 Mont. 521, 526, 813 P.2d 429, 432, we explained,

> While the term "loss of consortium" has been attached to the children's claim, the broader term, "loss of society and companionship," is equally appropriate. Use of the latter term avoids the narrower construction connoting this right derives primarily from the sexual relationship incident to marriage.  While companionship may include sexual relations [*See, e.g.* Prosser, Torts § 125 at 889 (4th Ed. 1971) as cited in CJI-Civ.2d 6:7 (1980)], courts have continued to regard loss of consortium to embrace all of those values--tangible and intangible--inherent in the family relationship.  In his treatise, [H. Clark, *Domestic Relations* § 10.1 (1968)], Clark asserts that the term loss of consortium is equally appropriate in reference to the parent-child relationship to summarize "the multitude of rights and duties binding parents to their children and vice versa." *Clark* at § 10.1.

*See also, Gunning v. General Motors Corp.* (1989), 239 Mont. 104,107, 779 P.2d 64, 66 ("Consortium includes a legal right to the aid, protection, affection and society . . . ."); *Bain v. Gleason* (1986), 223 Mont. 442, 445, 726 P.2d 1153, 1155 ("We further agree with the court in *Dutton*, . . . that consortium includes a legal right to the . . . affection and society of the other spouse.").  We therefore conclude that the $200,000.00 damages awarded to Robert and the $300,000.00 awarded to Ardell for "loss of society, comfort care, and companionship" constitute the "loss of consortium" damages awarded in this case.

¶45    Safeco maintains that Montana law does not recognize a parent's claim for loss of consortium for the death of an adult child.  Furthermore, Safeco argues that Robert Hern, who was not Becky's personal representative, could not in any event lawfully assert a loss

16

of consortium claim or a "grief, sorrow and mental anguish" claim, as only the personal representative may pursue such wrongful death damages.

¶46    As indicated above, under § 27-1-513, MCA, the personal representative of the decedent's estate is authorized to bring an action for wrongful death.  This statute and its predecessor have been interpreted to mean that *only one* wrongful death action arising out of a wrongful death may be brought and the decedent's personal representative is the only person who may bring such an action.  The personal representative holds the proceeds of any damage award for the heirs of the decedent and the award does not become part of the decedent's estate.  *Renville v. Frederickson*, 2004 MT 324, 324 Mont. 86, 101 P.3d 773.

¶47    In the case before us, Robert was not the personal representative of Becky's estate and, therefore, it was error for the District Court to instruct the jury that it could award damages of any kind to Robert personally, in the wrongful death claim.  Therefore, we vacate the $500,000.00 awarded to Robert as part of the wrongful death claim, $300,000.00 of which was for grief, sorrow, and mental anguish, and $200,000.00 for loss of consortium.

¶48    We next review the damages awarded to Ardell as Becky's personal representative.  As indicated above, the jury awarded $300,000.00 to Ardell for "loss of society, comfort care, and companionship," and $450,000.00 for "grief, sorrow, and mental anguish."  The Herns maintain that a claim for loss of consortium of an adult child in the context of a wrongful death action is compensable under Montana statute, applicable case law, and for

17

sound public policy reasons. Therefore, we turn to an analysis of the $300,000.00 loss of consortium award to Ardell.

¶49    Ardell maintains that § 27-1-323, MCA, recognizes a broad range of damages "as under all the circumstances of the case may be just." Moreover, she urges us to adopt the rationale of the U.S. District Court in Montana (hereinafter the "federal court") in *Bear Medicine v. U.S.*, (D. Mont. 2002) 192 F.Supp.2d 1053.

¶50    In *Bear Medicine*, the thirty-three year old son of George and Molly Kicking Woman, Leland Kicking Woman, was seriously injured at a logging site on the Blackfeet Reservation. Leland, who was at the site seeking a job, was getting a tour of the site by his friend, Malcolm New Robe. While the two men were watching another employee fell a tree, the tree being cut fell in an unintended direction. Leland saw the tree falling in his and Malcolm's direction but realized that Malcolm did not see it. Leland quickly pushed Malcolm to safety and the tree struck Leland, rendering him a quadriplegic. Approximately nine months later, Leland died from complications associated with his injuries. *Bear Medicine*, 192 F.Supp.2d at 1058-60.

¶51    Leland was survived by his parents, his sister, his wife, and six children. In addition to other damages awarded to his wife and children, the federal court allowed Leland's parents to recover for loss of consortium. The federal court speculated, as well, that the Montana Supreme Court would adopt a cause of action for parents of adult children. *Bear Medicine*, 192 F.Supp.2d at 1059-60 and 1067-69.

18

¶52 To understand the federal court's ruling, it is important to understand Leland's relationship with his parents. Leland's father is a bundle holder in the Blackfeet Tribe and is entrusted with important duties in their traditional culture. George had been tutoring Leland to perform various sacred rituals on behalf of the Tribe. Leland had been undergoing training for at least fifteen years to be a spiritual leader and holder of the "Thunder Pipe Bundle." The federal court explained that the Thunder Pipe is probably 400 years old and had come down through Molly's family, with George being the holder for fifty-three years. Leland had been groomed to replace his father in this very important cultural role since his early teens. Leland's death was a serious loss to his parents, his family and his Tribe. *Bear Medicine*, 192 F.Supp.2d at 1062-63.

¶53 Moreover, Leland was a devoted son who ran his parents' ranch and lease holdings. In addition to being an active participating father of his six children, Leland spent many hours with his elderly parents offering comfort, care, counsel and companionship. His strong relationship with his parents reinforced the cultural ties that bind the generations of Blackfeet. Because of his unique personality, disciplined life style and deep cultural connections, his parents chose him to carry on the family's tradition of tribal and spiritual leadership. Both George and Molly underwent psychological counseling to help them deal with their grief and the tragic loss of their son. *Bear Medicine*, 192 F.Supp.2d at 1064-65.

¶54 The federal court explained its rationale for expanding recovery to the parents of an adult child by stating:

19

The Montana Supreme Court has "recognized repeatedly [its] authority and responsibility for the continued development of the common law" in this area. Montana allows loss of consortium claims by a husband or wife whose spouse has been killed or injured. Montana also allows loss of consortium claims by a minor child or a parent whose minor child or parent has been killed or injured. Allowing a loss of consortium claim for parents of adult children only furthers this development of the common law and is consistent with the purposes of the law recognized by the legislature of the State of Montana as interpreted by the Montana Supreme Court.

*Bear Medicine*, 192 F.Supp.2d at 1067 (internal citations omitted).

¶55　In addition to the federal court's reliance on Montana policy in this area, it also relied on *Howard Frank, M.D., P.C. v. Superior Court* (Ariz. 1986), 722 P.2d 955. In *Frank*, the Arizona court reasoned that parents should be able to recover for the loss of consortium of an adult child because the grief and sorrow of losing a child does not end when that child turns eighteen. The federal court noted that we have previously followed the rationale of the Arizona Supreme Court in another important loss of parental consortium claim. *See Keele v. St. Vincent Hosp. & Health Care* (1993), 258 Mont. 158, 162, 852 P.2d 574, 577, wherein we cited *Villareal v. State, Dept. of Transp.* (Ariz. 1989), 774 P.2d 213. *Bear Medicine*, 192 F.Supp.2d at 1067.

¶56　In *Keele*, relying on *Pence,* the district court dismissed a minor's claim for loss of parental consortium because the parent who suffered the tortious injury was not rendered a quadriplegic. We concluded that the court's interpretation of *Pence* requiring quadriplegia was too narrow. We therefore crafted a new standard to be applied to loss of parental consortium claims and relied heavily on *Villareal's* rationale.

¶57 Lastly, the federal court recognized that "[t]he loss of [the parent-child] relationship, not the arbitrary age of the individuals involved, determines whether a loss of consortium claim is appropriate. Once viewed in this manner, it is proof of the quality of the relationship that should logically govern the extent of any claim by a parent concerning their damages incurred by the death of their adult child." *Bear Medicine*, 192 F.Supp.2d at 1067-68.

¶58 We conclude that under certain circumstances such as those evidenced by the relationship between Leland Kicking Woman and his parents, the bond between parents and an adult child, and the loss experienced by the parents at the death of or serious injury to their child, may be of such quality as to warrant recovery by the parents for loss of consortium. Having said this, we cannot craft a hard and fast set of facts or rule that will define exactly under what circumstances a loss of consortium claim by parents of an adult child will stand. Rather, each case must be determined on the facts and evidence presented. We conclude, however, that significant evidence of an extraordinarily close and interdependent relationship must be presented before a court may consider awarding loss of consortium damages to the parents of an adult child.

¶59 Typically, it would be the province of the district court to determine whether evidence of such a quality parent-child relationship could be found; if insufficient evidence existed, the district court could so determine as a matter of law. If sufficient evidence of such a quality relationship existed in the court's view, it would then be the jury's responsibility to determine whether such a relationship actually existed and, if so, whether it warranted

recovery under a loss of consortium claim. However, given the record here, we conclude that remand for further proceedings is unnecessary.

¶60    Prior to trial, the parties submitted to the District Court briefs on the issue of whether Becky's parents could recover damages for the loss of consortium of their adult daughter. Herns argued entitlement to such damages on the basis of *Bear Medicine,* and Safeco likewise addressed the applicability of the case. At trial, Herns presented to the jury that evidence which they had claimed in their briefs entitled them to consortium damages under *Bear Medicine.* While the District Court never formally held that *Bear Medicine* was the standard, nonetheless *after* being briefed on the *Bear Medicine* standard, it instructed the jury that it could award consortium damages to the parents. Thus, the District Court had before it at trial the same evidence and law it would be called upon to consider in the event we were to remand this issue for further consideration. We therefore conclude that remand is unnecessary.

¶61    Upon reviewing the evidence of the relationship between Becky and her parents, we conclude as a matter of law that the *Bear Medicine* standard has not been met. While we sympathize with the Herns for the loss of their daughter, we reiterate that a high level of proof must be met before such damages may be awarded. We note specifically that Becky did not contribute to the financial support of her parents, nor did she manage their property or holdings. Moreover, a critical factor in the federal court's ruling in *Bear Medicine* was the unique role Leland performed to the family's tradition of tribal and spiritual leadership.

22

No similar factor is evident in the case before us. Therefore, we conclude that the award of $300,000.00 for loss of consortium damages to Ardell must be vacated.

¶62    However, we affirm the jury's award of $450,000.00 to Ardell for grief, sorrow, and mental anguish. It is well established that a jury may award "reasonable compensation for grief, sorrow and mental anguish" in wrongful death actions. *See Busta v. Columbus Hosp. Corp.* (1996), 276 Mont. 342, 916 P.2d 122; *Estate of Spicher v. Miller* (1993), 260 Mont. 504, 861 P.2d 183; *Dawson v. Hill & Hill Truck Lines* (1983), 206 Mont. 325, 671 P.2d 589. *See also* MPI 25.22 ("reasonable compensation for grief, suffering and mental anguish" may be awarded in wrongful death actions). As personal representative of Becky's estate, Ardell was entitled to pursue such damages on behalf of herself and Becky's heirs. We therefore decline to disturb this award.

¶63    *4. Did the District Court abuse its discretion by permitting the jury to apportion damages under a "special verdict" form?*

¶64    Safeco argues on appeal that the special verdict form used by the District Court allowed the jury to award damages separately to Robert and Ardell Hern for: 1) the loss of society, comfort, care and companionship of their daughter, and 2) grief, sorrow, and mental anguish. Safeco maintains that this "four times apportionment" amongst the heirs runs directly counter to this Court's previous pronouncement in *Swanson* that damages in a wrongful death action must be returned by "general" verdict. It maintains that the use of special verdict forms can cause confusion and duplication of damage awards.

¶65 Having reversed the jury's awards to Robert under the wrongful death claim, and having reversed the loss of consortium award to Ardell, we have removed the objectionable entries of the special verdict. Therefore, we need not address this issue further.

¶66 *5. Did the District Court err in awarding the Herns damages in excess of the $2,000,000.00 policy limit through the addition of interest?*

¶67 Safeco maintains on appeal that it was error for the court to award interest on the Herns' verdict, because the award pushed Herns' recovery over the $2,000,000.00 policy limit. Our review of the record reveals that Safeco did not present this argument to the District Court. When Safeco filed its Response to Herns' Motion to Amend Judgment, Safeco argued that under the *Seltzer* Settlement only class members who settled their claims under the class action, as opposed to litigating them, were entitled to interest. The District Court rejected this argument and amended the judgment to include prejudgment interest. Safeco now argues--for the first time on appeal--that its maximum liability for damages, plus interest, cannot exceed the policy limits. This is an entirely new theory, and as such, we decline to address it. As we have held on many occasions, "this Court will not consider new issues or changes in legal theory on appeal." *State v. Yecovenko*, 2004 MT 196, ¶ 22, 322 Mont. 247, ¶ 22, 95 P.3d 145, ¶ 22 (citations omitted). Therefore, we decline to disturb the District Court's award of interest.

**CONCLUSION**

¶68 For the foregoing reasons, we affirm the District Court on the following issues: 1) its grant of summary judgment to the Herns; 2) its instruction on "lost household services";

24

3) its award of damages to Ardell as personal representative for grief, sorrow, and mental anguish, and 4) its award of prejudgment interest. We vacate: 1) the $1.5 million award to Becky's estate for "loss of established course of life," 2) Robert's $500,000.00 in wrongful death damages, and 3) Ardell's $300,000.00 loss of consortium award. These vacated damages totaling $2,300,000.00--deducted from the jury award of $3,810,034.10--leave damages to the estate and Ardell in the net amount of $1,510,034.10.

¶69    Unlike the situation before the District Court in post-judgment proceedings, the net damages are within the $2,000,000.00 aggregate damages available under the Safeco policies pursuant to the *Seltzer* Settlement. It is then appropriate to subtract from the net damages, as the District Court properly did, the $156,250.00 representing the amount of UM benefits paid by Safeco to the Herns as part of the original proceeding, resulting in total damages to the Herns of $1,353,784.10. We therefore remand to the District Court for a calculation of prejudgment interest on $1,353,784.10, and order Safeco to pay to the Herns the principal and interest due them hereunder.

25

¶70    Affirmed in part and reversed and remanded in part.

/S/ PATRICIA O. COTTER

We Concur:

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

Chief Justice Karla M. Gray, concurring in part and dissenting in part.

¶71 I concur in the Court's opinion except for those portions of the discussion of Issue 3 recognizing a parent's loss of consortium claim for the death of an adult child. I respectfully dissent therefrom and would follow the lead of other jurisdictions in declining to recognize a cause of action for a parent's loss of consortium of an adult child.

¶72 The Court's opinion is premised on the prediction of a United States District Judge for the District of Montana in *Bear Medicine*, that we would adopt a loss of consortium cause of action for parents of adult children. We are not constrained to fulfill the Federal District Court's prediction. *See Maney v. Louisiana Pacific Corp.*, 2000 MT 366, ¶ 26, 303 Mont. 398, ¶ 26, 15 P.3d 962, ¶ 26 (citations omitted). I would not do so in the present case.

¶73 I do agree with Chief Judge Molloy's observation in *Bear Medicine*, 192 F.Supp.2d at 1067, that this Court has "recognized repeatedly [our] authority and responsibility for the continued development of the common law." In that regard, I take this opportunity to briefly review the development of Montana law concerning claims arising out of the parent-child relationship.

¶74 In *Dawson v. Hill & Hill Truck Lines* (1983), 206 Mont. 325, 671 P.2d 589, we answered a certified question asking whether damages for sorrow, mental distress or grief of the parents of a deceased minor were recoverable in a wrongful death action brought pursuant to § 27-1-512, MCA (1979). Two statutes were at issue. Section 27-1-512, MCA

27

(1979), allowed a parent or guardian to bring an action for injury to--or the wrongful death of--a minor child or ward. Section 27-1-323, MCA (1979), provided: "[i]n every action under 27-1-512 and 27-1-513, such damages may be given as under all the circumstances of the case may be just." We determined that parents may recover for sorrow, mental distress or grief resulting from the death of a minor child in a wrongful death action pursuant to § 27-1-512, MCA (1979). *Dawson*, 206 Mont. at 332-33, 671 P.2d at 593-94.

¶75    In *Pence v. Fox* (1991), 248 Mont. 521, 813 P.2d 429, we were asked whether a minor child has a separate cause of action for loss of parental consortium when a parent is tortiously injured and rendered quadriplegic. In responding, we traced the history of consortium claims back to ancient Roman civil law, under which only a husband could bring a claim for loss of consortium. We observed that the law finally recognized a wife's right to bring consortium claims for loss caused by negligence in 1950. *Pence*, 248 Mont. at 523, 813 P.2d at 430-31 (citations omitted). We also noted that minor children have been able to bring consortium claims for the death of a parent since 1983. *Pence*, 248 Mont. at 524, 813 P.2d at 431 (citation omitted).

¶76    In discussing whether to broaden a child's consortium claim to encompass a parent tortiously injured and rendered quadriplegic, we focused on a minor child's legal rights to the support, aid, protection, affection, society, discipline, guidance and training of their parents. *Pence*, 248 Mont. at 526-27, 813 P.2d at 432-33. On that basis, we held that minor children who have been deprived of those rights have a separate cause of action for

28

loss of consortium when a parent is tortiously injured and rendered a quadriplegic. *Pence*, 248 Mont. at 527, 813 P.2d at 433.

¶77 Finally, two years later in *Keele v. St. Vincent Hosp.* (1993), 258 Mont. 158, 852 P.2d 574, which I was proud to author for the Court, we expanded *Pence* under our authority and responsibility for the continued development of the common law. *Keele*, 258 Mont. at 161, 852 P.2d at 576. We saw no rational basis for limiting loss of parental consortium claims to children whose parents are rendered quadriplegic. Ultimately, we held that a minor child may establish a claim for loss of parental consortium by showing (1) a third party tortiously caused the parent to suffer a serious, permanent and disabling mental or physical injury compensable under Montana law; and (2) the parent's condition of permanent mental or physical impairment is so overwhelming and severe that it causes the parent-child relationship to be destroyed or nearly destroyed. *Keele*, 258 Mont. at 162, 852 P.2d at 577.

¶78 This Court, over time, has properly developed the law regarding loss of consortium claims between parents and children. That we have expanded the law in this area in the past, however, does not require that we forever approve every expansion of the law presented to us. Nor, in my view, does wisdom support such an approach.

¶79 Loss of consortium is based on the recognition of a legally-protected interest in a personal relationship. *See United States v. Standard Oil Co. of Cal.* (1947), 332 U.S. 301, 311-12, 67 S.Ct. 1604, 1610, 91 L.Ed. 2067, 2074. Parents bear a natural and legal burden of care for their minor children. Similarly, minor children are legally entitled to the support,

29

aid, affection and guidance of their parents. The same simply is not true for parents and adult children. Not every loss can be made compensable. Inevitably, lines must be drawn establishing the legal limits of liability for a tortious act. As a result, allowing tort claims for loss of consortium by parents of an adult child has less legal and logical support than allowing such claims by parents of a minor child.

¶80 In fact, the majority of jurisdictions which have addressed this issue have not recognized a cause of action for loss of consortium for a parent of an adult child. *Boucher v. Dixie Medical Center* (Utah 1992), 850 P.2d 1179, 1183. *See also Morris v. State* (Tenn. Ct. App. 1999), 21 S.W.3d 196, 200; *Cole v. Broomsticks, Inc.* (Ohio App. 1 Dist. 1995), 669 N.E.2d 253, 256, *appeal not allowed*, 663 N.E.2d 1301; and *Counts v. Hospitality Employees, Inc.* (Iowa 1994), 518 N.W.2d 358, 361. Reasons for declining to judicially expand the law to recognize claims for parents' loss of consortium of an adult child include that the injury is too remote from the negligence or too out of proportion to the culpability of the negligent tortfeasor, and allowing recovery would place too unreasonable a burden on negligent tortfeasors and would enter a field that has no sensible or just stopping point. *See Morris*, 21 S.W.3d at 200 (citations omitted). I agree with those reasons.

¶81 I would decline to judicially extend the common law to create a new tort action for a parent's loss of consortium of an adult child. As is clear from the present case, Ardell had--and successfully prosecuted--a claim for compensation for "grief, sorrow and mental anguish" in the wrongful death action. There is simply no need for yet another judicially-created "remedy."

30

/S/ KARLA M. GRAY

Justice Jim Rice and Justice John Warner join in the foregoing concurring and dissenting opinion of Chief Justice Karla M. Gray.

/S/ JIM RICE
/S/ JOHN WARNER