JUSTICE WHEAT
delivered the Opinion of the Court.
¶1 The United States District Court for the District of Montana, Missoula Division, the Honorable Dana L. Christensen presiding, has certified the following questions to this Court:
2. Does Montana law recognize a claim for loss of consortium by the adult child of an injured parent ?

2. If Montana recognizes a claim for loss of consortium by the adult child of an injured parent, what evidentiary standard must the plaintiff meet in order to assert such a claim?

¶2 We accepted the certified questions and now answer that Montana law recognizes a claim for loss of consortium by the adult child of an *27 iiyured parent, and that to assert such a claim, the plaintiff must show that (1) a third party tortiously caused the parent to suffer a serious, permanent and disablingmental or physical injury compensable under Montana law, and (2) the parent’s ultimate condition of mental or physical impairment is so overwhelming and severe that it has caused the parent-child relationship to be destroyed or nearly destroyed. Relevant to establishing the plaintiffs cause of action, and to a jury’s determination of damages, will be evidence of the severity of injury to the parent; the actual effect that the parent’s injury has had on the relationship and is likely to have in the future; the child’s age; the nature of the child’s relationship with the parent; and the child’s emotional, physical and geographic characteristics.
PROCEDURAL AND FACTUAL BACKGROUND
¶3 The parties have stipulated to the following pertinent facts, set forth in the U.S. District Court’s certification order.
¶4 On August 12, 2009, Calvin Stucky (Calvin) was injured in a motor vehicle accident in Powell County on Highway 141, when a vehicle headed in the opposite direction crossed the center line and collided head-on with his Ford truck. As a result of this collision, he sustained significant injuries with extensive physical and emotional effects. At the time of the collision, his daughters, Sadee and Callie Jo, were eighteen and fifteen, respectively.
¶5 North Pacific Insurance Company (NPIC) issued a Commercial Auto Policy (the Policy) to Earl Stucky and Glenna Stucky. The policy period at issue was from October 24, 2008, to October 24, 2009. The Policy names Calvin and his wife, Renee Stucky (Renee), as insureds under the Policy. Calvin purchased a 1980 Ford truck on or about May 27,2009. NPIC alleges that the 1980 Ford truck was never added to the Policy for insurance coverage. Calvin alleges that he did request the 1980 Ford truck to be added to the Policy.
¶6 The Policy provides Under Insured Motorist (UIM) coverage in pertinent part as follows:
We will pay all sums the “insured” is legally entitled to recover as compensatory damages from the owner or driver of an “underinsured motor vehicle.” The damages must result from “bodily injury” sustained by the “insured” caused by an “accident.” The owner’s or driver’s liability for these damages must result from the ownership, maintenance, or use of the “underinsured motor vehicle.”
The Policy provides that an “insured” includes any “family members” of an individual who is a named insured. A “family member” is defined *28 as “a person related to an individual Named Insured by blood, marriage or adoption who is a resident of such Named Insured’s household, including a ward or foster child.” Renee, Sadee and Callie Jo allege they are insureds under the Policy and are entitled to UIM benefits as a result of Calvin’s accident.
¶7 Calvin was the only person occupying the 1980 Ford truck when the accident took place. His injuries from the accident are extensive and include: Traumatic brain injury (TBI)/closed head injury with executive level deficits and emotional dyscontrol; left acetabular fracture, sacroiliac joint disruption, S/P ORIF (open reduction internal fixation); left hip sciatic nerve entrapment secondary to left acetabular fracture and sacroiliac joint disruption; T10 vertebral fracture, S/P T8-T12 fixation; left hip extensive heterotopic ossification requiring surgical excision; mood disorder; loss of cognitive function; left lower extremity impairments; personality changes secondary to TBI; memory loss secondary to TBI; word finding difficulty secondary to TBI; headaches secondary to TBI; insomnia secondary to TBI; balance dysfunction secondary to orthopedic dysfunction; anger issues secondary to TBI; depression secondary to TBI; Bipolar I disorder secondary to TBI; chronic pain/hip arthralgias supported by chronic left hip pain secondary to HO; facial and orbital fractures; left hypertropia and esotropia due to motor vehicle accident; S/P eye surgery (right inferior rectus recession, right medial rectus recession); right shoulder posterior labral tear; likely chronic right shoulder pain and possible functional limitations. He underwent multiple surgeries as a result of the accident.
¶8 Although Calvin has made improvements, he still suffers from difficulty with word finding; memory loss; balance dysfunction; visual problems; mood fluctuations; angry outbursts; physical weakness; limited ability to move; depression; agitation from over-stimulation; physical violence toward family members; dislike for people; asocial behavior; hip, back and leg pain; balance difficulties; right foot pain; cognitive limitations; visual limitations; and neuropsychological issues. He requires 24/7 supervision because ofmemory, executive functioning and physical limitations. He has reached his maximum medical recovery and will continue to require 24/7 supervision and physical assistance. He will require a legal guardian. He cannot drive a motor vehicle. He will require neuropsychological follow up and behavioral intervention. He will require psychiatric intervention and monitoring. The deficits created by his injuries are permanent and are expected to worsen with the effects of aging. This will increase the level of care he will require over time, and will call for additional services. It is *29 estimated that his life care will cost approximately $4,600,000.
¶9 Calvin filed a claim with the other driver’s liability insurer and also filed a claim with NPIC. NPIC filed a complaint to obtain a declaration that there is no UIM coverage for the accident because the 1980 Ford truck was never added to the Policy- The Defendants filed their counterclaim to obtain a declaration that there is UIM coverage for the accident. They requested damages arising from breach of contract, alleging that NPIC breached its contract with them by failing to provide coverage and that NPIC should be held liable for refusing to provide coverage.
¶10 Sadee was eighteen years old at the time of Calvin’s accident. While growing up, Sadee spent time every day with Calvin and Renee. Calvin coached Sadee’s basketball team. He helped her learn how to rope, ride horses, play basketball and sing. He was the teacher of her life, her guidance counselor. She resided with her parents at the Stucky Ranch in Avon, Montana, lor her entire life until she went to college in Bozeman, Montana, in August 2009, the week after Calvin’s accident. Had the accident not occurred, Calvin and Renee would have moved Sadee to Bozeman. Because of the accident, however, Calvin was in a coma in Seattle and Renee was with him, so neither was there to help Sadee move into the college dormitory. While living in the college dormitory, every day Sadee had to face the fact that all of the other girls had their fathers and she did not.
¶11 During the summer of 2009, Sadee worked part time at the Avon Cafe. From August 2009 until May 2010, Sadee lived in Bozeman on the Montana State University (MSU) campus and attended college. During the summer of 2010, Sadee moved back home to live with Calvin and Renee. She worked on the ranch and again part time at the Avon Cafe. During that time, she was available to spend time with Calvin and to help Renee care for him. In August 2010, Sadee returned to Bozeman to attend school and lived on campus until May 2011. From May 2011 to August 2012, Sadee continued to attend college at MSU and lived in Bozeman, off campus, with two roommates. She worked at Famous Dave’s during this time. From August 2012 to December 2012, Sadee continued to attend college at MSU, lived in Bozeman, and worked part time at Famous Dave’s. Engulfed by the pain Calvin’s accident had caused her, Sadee was not able to keep up with college and dropped out in December 2012, with only one semester left. She emotionally and mentally could not return to college after December. Sadee has been working full time since January 2013. ¶12 Sadee was raised to be strong and independent but, since the accident, has been struggling. Until recently, she has not sought any *30 counseling as a result of her father’s injuries because she could not open up and talk about it. She thought that as long as she did not seek counseling or discuss it, the pain would go away. Additionally, she financially could not afford counseling and her health insurance would not cover the cost. However, Sadee began seeing Dr. Kenneth Olson, a psychiatrist in Bozeman, on October 25,2013, and has continued to see him since. She has been diagnosed with Post-Traumatic Stress Disorder (PTSD), sleep dysftmction and cyclothymic disorder.
¶13 The entire family dynamics have changed since Calvin was injured. In addition to losing her father, Sadee has, in effect, lost her mother because Renee is too busy taking care of Calvin to provide love, affection, time, guidance and support. The accident and Calvin’s injuries have affected Sadee’s relationship with Renee and Callie Jo. Sadee finds it painful to go home to the ranch because everything is different.
¶14 Calvin was taken from Sadee before she had a chance to develop an adult relationship with him. There are many things she would like to be able to ask Calvin, but she cannot. Prior to Calvin’s accident, Sadee was very active and looked forward to doing and learning new things. Since the accident, she cannot develop the motivation to do things, she does not sleep well, and she has gained sixty-five pounds. The accident is in the back of Sadee’s mind at all times. She cannot get it out of her head. She is frequently sad and experiences feelings of grief that Calvin will never be what or who he was. For the first two years after the accident, Sadee assumed Calvin would recover and return to his normal functioning. Now she has realized that he is never going to get better. He will not return to his old self and she cannot see ever living a normal life with him again.
¶15 Sadee expected that she would have the love and affection of her father for all of her life. She expected that he would be there for her when she needed guidance, love and support; that he would have helped her financially with college; that when she went home for the summers during college they could work together on the ranch; and that they would be able to laugh, talk and share with one another. Had the accident not occurred on August 12, 2009, these expectations could have been realized, but now, they never will be.
¶16 Sadee claims damages for loss of parental services, society, or consortium; loss of support; grief and sorrow; and mental and emotional distress; and seeks attorney fees. Her asserted legal basis for recovery is: “Pursuant to the insurance contract with Plaintiff (polity language), Sadee and Callie Jo are insured parties also, under the policy. Therefore, as insured family members, they are also entitled to *31 damages for the injuries caused by the third party tortfeasor, when the tortfeasor is underinsured.”
¶17 NPIC moved for summary judgment with respect to Sadee’s loss of consortium claim, asserting that Montana law does not recognize a claim for loss of consortium by the adult child of an injured parent. NPIC further contended that, even if Montana law did recognize a claim for loss of consortium by the adult child of an injured parent, it would require the plaintiff to establish “significant evidence of an extraordinarily close and interdependent relationship” as in the context of a claim for loss of consortium by the parent of an adult child. The federal court, which had diversity jurisdiction, concluded that resolving NPIC’s motion involved important questions of public policy and thus, certified the matter to this Court pursuant to Rule 15 of the Montana Rules of Appellate Procedure.
STANDARD OF REVIEW
¶18 When answering a certified question from another qualifying court as permitted by M. R. App. P. 15(3), our review is “purely an interpretation of the law as applied to the agreed facts underlying the action.” Van Orden v. United Servs. Auto. Ass’n, 2014 MT 45, ¶ 10,374 Mont. 62, 318 P.3d 1042 (quotations and citations omitted).
DISCUSSION
¶19 1. Does Montana law recognize a claim for loss of consortium by the adult child of an injured parent ?
¶20 The defendants assert, and NPIC seems to imply, that Montana law should recognize a claim for loss of consortium by an adult child based on injury to the parent. The parties differ as to how such a claim should be defined. NPIC argues that a loss of consortium claim brought by the adult child of an injured parent should be recognized only in narrow circumstances and should be subject to a very high level of proof. The defendants, and amicus Montana Trial Lawyers’ Association (MTLA), argue that such a claim should be established by evidence of a loss, shown on a more-likely-than-not basis, which considers the facts and circumstances of the loss.
¶21 We conclude that Montana law recognizes a loss of consortium claim by the adult child of an injured parent, and that such a claim, deriving from the common law, is supported by our statutes and Constitution. We have recognized that ^judicial modification of the common law is sometimes required to prevent great injustice or to insure that the common law is consonant with the changing needs of *32 society.” Miller v. Fallon County, 222 Mont. 214, 217-18, 721 P.2d 342, 344(1986).
¶22 Historically, the law recognized only a husband’s loss of consortium, claim when injury to his wife was caused by the intentional tort of another. Pence v. Fox, 248 Mont. 521, 523, 813 P.2d 429, 431 (1991). The right expanded to include consortium claims when the loss was caused by an act of negligence. Pence, 248 Mont, at 523, 813 P.2d at 431. Over time, the law also evolved to recognize the wife’s right to bring consortium claims for losses of spousal consortium caused by intentional or negligent acts. Pence, 248 Mont, at 523, 813 P.2d at 431. Montana’s precedent follows the emerging trend of expanding common law loss of consortium claims. See Bear Medicine v. U.S., 192 F. Supp. 2d 1053, 1067 (D. Mont. 2002) (recognizing a loss of consortium claim for parents of an adult child, reasoning that the Montana Supreme Court has “recognized repeatedly” its authority and responsibility for developing the common law).
¶23 The first recognition of a wife’s claim for loss of consortium caused by a defendant’s negligence in Montana occurred in Duffy v. Lipsman-Fulkerson & Co., 200 F. Supp. 71 (D. Mont. 1961), by the Montana Federal District Court. The court noted that a cause of action is established by the combination of two elements: A right on the part of a plaintiff, and an invasion of that right by the defendant. Duffy, 200 F. Supp. at 72. Although the court cited statutes defining a wife’s rights under a marriage contract to support its opinion, it noted that there was “no express statutory authorization” for such an action and “no Montana Supreme Court decision directly on the point.” Duffy, 200 F. Supp. at 72. The court reasoned that because the law recognized a husband’s claim for loss of consortium caused by another’s negligent harm to the wife, the law should recognize the same cause of action brought by the wife of a negligently injured husband. Duffy, 200 F. Supp. at 74. Ultimately, the court concluded that “Montana is committed to the common law as the law and rule of decision, and ... the common law recognized the husband’s right to maintain such action.” Duffy, 200 F. Supp. at 75. Thus, the cause of action the federal court initially recognized is primarily founded in the common law. ¶24 In Dutton v. Hightower & Lubrecht Constr. Co., 214 F. Supp. 298 (D. Mont. 1963), the federal court again addressed the wife’s right to bring a loss of consortium claim for a defendant’s negligent injury to her husband. In that case, the court relied on statutes defining the civil contractual relationship between husband and wife as the source of the right to consortium in its analysis. Dutton, 214 F. Supp. at 300. The *33 court explained that statutes defining the rights a woman obtains by virtue other marriage had supplanted the common law, which denied the wife a cause of action or the right to sue for loss of consortium. Dutton, 214 F. Supp. at 300. The Dutton court did not hold, however, that the source of a right giving rise to a loss of consortium claim necessarily had to be in statute; rather, the court reasoned that the legislature had passed statutes that supplanted the common law, to the extent that the common law had limited a wife’s cause of action for loss of consortium due to a defendant’s negligence. Dutton, 214 F. Supp. at 300.
¶25 Following in the footsteps of the federal court, this Court first recognized a cause of action for loss of consortium by the deprived spouse in Bain v. Gleason, 223 Mont. 442, 726 P.2d 1153 (1986). In Bain, we determined that the husband of an injured wife could bring a loss of consortium claim “separate and distinct” from the wife’s claim against the tortfeasor and that the basis for such a claim was the statutory contractual obligation between husband and wife, set forth in § 40-2-101, MCA. Bain, 223 Mont, at 445, 726 P.2d at 1155. We quoted this principle in Priest v. Taylor, 227 Mont. 370, 379, 740 P.2d 648, 653 (1987), where we also explained that, though separate and distinct, the spouse’s cause of action for loss of consortium is derivative of the other spouse’s claim. We later clarified the relationship between the statutory basis for a consortium claim set forth in Bain and the common law:
Section 40-2-101, MCA, does not “create” the cause of action. It merely defines the obligations which inhere in the marriage relationship and upon which the common law action is based. ... The statute merely codifies the policy behind the common law by recognizing that spouses contract with one another for mutual obligations.
Pence, 248 Mont, at 525, 813 P.2d at 432.
¶26 In Pence, we recognized a minor child’s loss of consortium claim related to the parent’s injuries, where the parent had been rendered quadriplegic by a tortfeasor. We pointed out that like the rights of a spouse, the rights of a child to support, aid, protection, affection and society of the parent derive from both statute and case law. Pence, 248 Mont, at 526, 813 P.2d at 432. In recognizing and defining a child’s right to parental consortium, we cited with approval the Alaska Supreme Court:
When a parent is seriously injured, his or her child suffers a loss of eryoyment, care, guidance, love and protection, and is also *34 deprived of a role model. Even courts that deny the parental consortium cause of action have acknowledged the reality of such emotional and psychological injury to the child, and the Alaska legislature has implicitly done so in allowing recovery by children for loss of consortium under Alaska’s wrongful death statute.
Precluding minor children from maintaining a cause of action for loss of parental consortium arising from their parent’s injury would, in our view, be inconsistent with the legislature’s authorization of such recovexy when the parent dies, and with our prior holding in Fruit that a husband or wife may recover damages for loss of consortium when an injured spouse survives. The claim for loss of parental consortium presented in this case is not sufficiently distinguishable from either spousal consortium claims in injury cases or children’s consortium claims in death cases to warrant nonrecognition.
Pence, 248 Mont, at 526-27, 813 P.2d at 433 (quoting Hibpshman v. Prudhoe Bay Supply, Inc., 734 P.2d 991, 994 (Alaska 1987) (citations omitted)). We concluded that the right of minor children to parental aid, protection, affection, society, discipline, guidance and training were supported by the best interest of the child test in custody determinations under § 40-4-212, MCA, and the light of the child to seek damages under Montana’s wrongful death statute. Pence, 248 Mont, at 527, 813 P.2d at 433.
¶27 We later refined Pence in Keele v. St. Vincent Hosp. & Heath Care Ctr., 258 Mont. 158, 852 P.2d 574 (1993), where we held that a parent need not have been rendered quadriplegic by an injury to give rise to a minor child’s cause of action for loss of parental consortium. In that case, we adopted the two-part standard for asserting such a cause of action set forth by the Arizona Supreme Court in Villareal v. Dept, of Transp., 774 P.2d 213 (Ariz. 1989). We borrowed heavily from Villareal in Keele and, here, we once again find the Arizona Supreme Courtis remarks worth noting: “ “While all family members enjoy a mutual interest in consortium, the parent-child relationship is undeniably unique and the wellspring from which other family relationships derive.’ ” Villareal, 774 P.2d at 217 (quoting Frank v. Super. Ct., 722 P.2d 956, n. 3 (Ariz. 1986)).
¶28 Applying our precedent, the Montana Federal District Court recognized a claim for loss of consortium by the parents of an injured adult child in Bear Medicine. We endorsed that application in Hern v. Safeco Ins. Co. of Ill., 2005 MT 301, ¶ 58, 329 Mont. 347, 125 P.3d 597, reasoning that under certain circumstances ... the bond between *35 parents and an adult child, and the loss experienced by the parents at the death of or serious injury to their child, may be of such quality as to warrant recovery by the parents for loss of consortium.” We explained that the nature of the circumstances giving rise to such a claim was not capable of easy definition or determination and, instead, each case had to be determined based on the facts and evidence presented. Hern, ¶ 58. We concluded that “significant evidence of an extraordinarily close and interdependent relationship” was necessary before a court could consider awarding loss of consortium damages to parents of an adult child. Hern, ¶ 58. A “high level of proof” was required, encompassing, for instance, evidence that the child had contributed to the parents’ financial support or managed their property or holdings. Hern, ¶ 61. This recognition reflected the federal court’s observation in Bear Medicine that “it is proof of the quality of the relationship that should logically govern the extent of any claim by a parent concerning their damages incurred by the death of their adult child.” Bear Medicine, 192 F. Supp. 2d at 1068. Neither Bear Medicine nor Hern relied on statutes to establish a legal right to consortium, however. The federal court in Bear Medicine found support for its decision to recognize a loss of consortium action for parents of an injured adult child in Montana’s wrongful death statute, § 27-1-513, MCA, but primarily based its result in the common law. Bear Medicine, 192 F. Supp. at 1068. In Hern, this Court relied entirely on Bear Medicine in its analysis of the loss of consortium claim there. Hern, ¶¶ 50-61.
¶29 The question of whether the adult child of an injured parent may assert a cause of action for loss of consortium is one of first impression in Montana. Other states’ courts have, however, previously addressed this issue. The Iowa Supreme Court, in Audubon-Exira Ready Mix, Inc. v. Ill. Cent. & Gulf R.R. Co., 335 N.W.2d 148, 152 (Iowa 1983), reconsidered an earlier decision in which it had limited loss of consortium recoveries to minor children, reasoning “even adult and married children have the right to expect the benefit of good parental advice and guidance.” (Quotation omitted.) The Washington Supreme Court, in recognizing a child’s claim for loss of consortium of an injured parent, declined to limit recovery to minor children, but rather left the child’s age as a matter for the jury to consider while fixing damages. Ueland v. Pengo Hydra-Pull Corp., 691 P.2d 190, 195 (Wash. 1984). The Ohio Supreme Court, extending the loss of parental consortium claim to emancipated, adult children, reasoned:
[J]ust as minor children look to their parents for emotional *36 support, [middle-aged] adult children who continue to enjoy a close relationship with their parents still depend upon their parents for affection, advice, and guidance as they become older.... Therefore, regardless of the age of the child, the loss to the parent-child relationship is real and should not be minimized.
Rolf v. Tri State Motor Transit Co., 745 N.E.2d 424, 426-27 (Ohio 2001). The trend among other courts is towards allowing recovery for the loss of the intangible benefits inherent in close familial relationships, in light of the enduring nature of family bonds. See e.g. Marquardt v. United Airlines, Inc., 781 F. Supp. 1487, 1491-92 (D. Haw. 1992) (Hawaii law recognizes a claim for loss of filial consortium by parents of an adult child and the action is focused on loss of the intangible elements of love, comfort, companionship and society); Nelson v. Four Seasons Nursing Ctr., 934 P.2d 1104, 1105 (Okla. Civ. App. 1996) (“There is simply no good reason to afford the personal right of companionship and the parent-child relationship less protection in cases involving adult children who seek to recover for injury to the parent-child relationship.”); Jordan v. Baptist Three Rivers Hosp., 984 S.W.2d 593, 601 (Tenn. 1999) (“Consortium losses are not to limited to spousal claims but also necessarily encompass a child’s loss, whether minor or adult.”); Fitzjerrell v. City of Gallup, 79 P.3d 836, 840-41 (N.M. Ct. App. 2003) (distinguished by Lamphere v. U.S., No. 06CV2174LAB (JMA), 2008 U.S. Dist. LEXIS 22917, *13 (S. D. Cal. Mar. 24, 2008)) (allowing a plaintiff to bring a claim for loss of consortium as long as he or she established evidence of a sufficiently close familial relationship and foreseeability of injury to that relationship). We find these authorities persuasive and their rationale consistent with our precedent establishing the common law in Montana.
¶30 Our statutes — although not directly on point — also reflect the recognition that parents and children provide a financial and emotional support system for one another well beyond the time when the child reaches the age of majority- For instance, our statutes require children and parents to support one another, where a child or parent becomes unable to provide for him or herself. Sections 40-6-214, -301, MCA. This Court has previously held that § 40-6-214, MCA, imposes on the parent of disabled adult children who are unable to care for themselves a duty to support the children to the extent of the parent’s ability In re M.A.S., 2011 MT 313, ¶¶ 14-15, 363 Mont. 96,266 P.3d 1267. It is consistent with the policy underlying our statutory scheme to recognize a cause of action for loss of consortium brought by the adult child of an *37 injured parent.
¶31 Finally, Article II, Section 16, of the Montana Constitution provides that “[c]ourts of justice shall be open to every person, and speedy remedy afforded for every injury of person, properly, or character.” We discussed this right of fall legal redress extensively in Meech v. Hillhaven W., 238 Mont. 21, 30, 776 P.2d 488, 493 (1989), concluding that the right is not fundamental, but rather guarantees the right to access the courts to seek a remedy for wrongs recognized by common law or statutory authority.
¶32 We conclude that it is a natural extension of Montana’s common law to recognize a cause of action for loss of consortium brought by the adult child of an injured parent. Such an action is consistent with our precedent, which has followed the national trend of expanding circumstances in which the law recognizes a cause of action for loss of consortium. It is farther supported by the policy of recognizing the enduring nature of the parent-child relationship which underlies our statutory scheme. Consequently, it is within our Constitution’s guarantee of fall legal redress for recognized wrongs. We answer the first question in the affirmative.
¶33 2. If Montana recognizes a claim for loss of consortium by the adult child of an injured parent, what evidentiary standard must the plaintiff meet in order to assert such a claim?
¶34 NPIC, relying on Hern, urges that we limit loss of consortium claims for adult children of injured parents to cases in which there exists “significant evidence” of an “extraordinarily close and interdependent relationship.” The defendants and amicus suggest, instead, that we require a claimant, on a more-likely-than-not basis, to establish a loss by presenting evidence to a jury of relevant facts including but not limited to: The severity of injury to the parent; the actual effect the parent’s injury has had on the relationship and is likely to have in the future; the child’s age; the nature of the child’s relationship with the parent; and the child’s emotional, physical and geographic characteristics.
¶35 In Keele, we set forth the elements a minor child must prove to establish a claim for loss of parental consortium:
1) a third party tortiously causes the parent to suffer a serious, permanent and disabling mental or physical injury compensable Tinder Montana law; and
2) the parent’s ultimate condition of mental or physical impairment must be so overwhelming and severe that it causes the parent-child relationship to be destroyed or nearly destroyed.
*38 Keele, 258 Mont, at 162, 852 P.2d at 577 (citing Villareal, 774 P.2d at 219). Discussing our adoption of that standard, we explained, as had the Villareal Court, that the first factor limits a minor child’s claim to one for injuries that are “compensable under Montana law” — or derivative of the parent’s tort claim. Keele, 258 Mont, at 162, 852 P.2d at 577. We also emphasized that the second factor is meant to establish that the destruction or near destruction of the parent-child relationship as a result of the parent’s impairment is a necessary element in establishing the cause of action itself, not merely a factor in computing damages. Keele, 258 Mont, at 163, 852 P.2d at 577; see Villareal, 774 P.2d at 219 (“Not all injuries to parents will result in a child’s claim for loss of consortium. We limit our holding to allow loss of consortium claims only when the parent suffers serious, permanent, disabling injury rendering the parent unable to provide love, care, companionship, and guidance to the child. The parent’s mental or physical impairment must be so overwhelming and severe that the parent-child relationship is destroyed or nearly destroyed.”) (citations omitted). The requirement in Hem, that a parent seeking damages for loss of an adult child’s consortium demonstrate evidence of an extraordinarily close and interdependent relationship, instead served to define an evidentiary threshold in an action for wrongful death of an adult child.
¶36 We can see no reason to adopt a different standard from the one set forth in Keele where an adult child’s claim for loss of parental consortium is at issue. We conclude that the Keele standard better reflects the relationship between the parties when it is the parent who suffers a disabling injury; it is only the age of the child that is different from that in Keele, and that is a matter for the jury to consider. Once the elements necessary to establish a claim for loss of parental consortium have been met, Keele, 258 Mont, at 162, 852 P.2d at 577, we conclude that the factors set forth by the defendants and amicus are relevant to a jury’s determination both of whether the Keele factors have been satisfied, and of what damages are appropriate. These factors, in fact, derive from Villareal. The Villareal Court, in setting the standard we adopted as modified in Keele, explained:
To bring a consortium claim, the child/plaintiff must show that the defendant injured the child’s parent in a manner that would subject the defendant to liability under ordinary tort principles. The injury to the parent must cause severe damage to the parent-child relationship. The child may recover for the loss of the parent’s love, affection, protection, support, services, *39 companionship, care, and society. In determining the amount of damages to award the child, relevant factors include, but are not limited to, the child’s age, the nature of the child’s relationship with the parent, the child’s emotional and physical characteristics, and whether other consortium-giving relationships are available for the child.
Villareal, 774 P.2d at 220-21. Thus, while we decline to adopt a new standard, we endorse the practice of presenting evidence — including, but not limited to, evidence of the severity of iqjury to the parent; the actual effect the parent’s injury has had on the relationship and is likely to have in the future; the child’s age; the nature of the child’s relationship with the parent; and the child’s emotional, physical and geographic characteristics — which tends to illustrate the nature of the loss to the jury. This is consistent with Hern’s recognition that each case must be determined on the facts and evidence presented. Hern, ¶ 58.
¶37 The special relationship factor proposed by NPIC would impose too harsh a limitation on an adult child’s cause of action for loss of consortium. The cause of action we recognize under the common law is not limited by its statutory "basis” as NPIC argues. Because our statutes do not define a cause of action, the common law governs, and may find support in the statutory framework. See Pence, 248 Mont, at 525, 813 P.2d at 432. Although we recognize that the nature of the parent-child relationship may change when the child reaches adulthood, the child’s need for parental support, aid, protection, affection, society, discipline, guidance and training do not evaporate upon reaching the age of majority. Rather, as the Ohio Supreme Court recognized in Rolf, an adult child’s need for a parent’s guidance may change or re-emerge as the child confronts the different obstacles he or she meets in new phases of life. As an "independent person who is expected to navigate his or her own way through life” the adult child’s path may be illuminated and smoothed by the benefit of a parent’s wisdom, love and insight. The extent and nature of the child’s need for a close parent-child relationship, and the extent of the injury to the parent’s ability to participate in one, may be evaluated by the jury as it determines whether the Keele factors have been satisfied and, if so, contemplates damages. It is worth noting, as well, that an adult child’s reliance on a parent for guidance and support is likely different from the parent’s reliance on a child that we discussed in Hem. No “extraordinarily close and interdependent relationship” is required for an adult child to be harmed, or even devastated, by the effective loss *40 of a close parent-child relationship.
CONCLUSION
¶38 We conclude that Montana law recognizes a claim for loss of consortium brought by the adult child of an injured parent. To establish a cause of action for loss of consortium, the plaintiff must establish: 1) a third parly tortiously caused the parent to suffer a serious, permanent and disabling mental or physical ipjury compensable under Montana law; and 2) the parent’s ultimate condition of mental or physical impairment is so overwhelming and severe that it has caused the parent-child relationship to be destroyed or nearly destroyed. In establishing his or her claim, the plaintiff may present evidence of factors including but not limited to the severity of injury to the parent; the actual effect the parent’s injury has had on the relationship and is likely to have in the future; the child’s age; the nature of the child’s relationship with the parent; and the child’s emotional, physical and geographic characteristics.
CHIEF JUSTICE McGRATH, JUSTICES SHEA and BAKER concur.